WILLIAMS et al. v. BARNEY et al.

No. 7336.   Decided Nov. 29, 1950.   (224 P. 2d 1042.)

Rehearing Denied February 19, 1951

See 31 C. J. S., Estoppel, Sec. 162. Promissory estoppel. See note, 115 A. L. R. 152. See, also, 19 Am. Jur. 657.

*P. N. Anderson,* Nephi, *A. U. Miner, Pugsley, Hayes.& Rampton,* Salt Lake City, for appellants.

*George W. Worthen,* Provo, *Arnold C. Roylance,* Springville, for respondents.

PRATT, Chief Justice.

This is a suit to quiet title to certain land, in which suit the issues narrowed down to the question of title to the following described land: The Northwest ¼ of the Northeast ¼, and the East Half of the East Half of Section 6, Township 11 South, Range 1 West, Salt Lake Meridian.

It may be well to mention here, parenthetically, that if the East Half of the East Half of Section 6 is included in all the instruments in plaintiffs' chain of title, in some of them it is written as E ¼ of Section 6, which designation would have to be interpreted as meaning the same as if one used the expression the E part of Section 6, and would refer to that one-fourth strip of Section 6, measured west-

ward from its eastern boundary. It is not the ordinary legal method of designating parts of sections by quarters.

Defendants Barney defend the case and claim the land by tax title purchase from Utah County—conceded to be fatally defective—and by estoppel. They prevailed in the lower court upon the estoppel, and this appeal followed. The estoppel upon which they prevailed was their third affirmative defense. Their first affirmative defense was based on the tax deed which was conceded at the trial to be defective. The second stated a possible cause of action in contract, and was not the basis of the decree of the trial court.

Plaintiffs' title was by mesne conveyances from a remote grantor whose title was conceded to have been good. One O. A. Penrod appears in plaintiffs' chain of title, as one of the grantors who conveyed the land by quitclaim deed to plaintiffs' immediate grantors. The estoppel, determined by the lower court, is founded upon the actions of this man Penrod—in particular with reference to what it is claimed he said at a meeting with the Utah County Commissioners and a Committee of residents from Elberta and vicinity, on June 3, 1940. These statements are quoted later in the opinion.

The facts generally of the case are these:

The land is located near Elberta, Utah, a small community in the south westerly part of Utah County. The area is dependent for its irrigation water upon the Mona Reservoir in Juab County. The irrigation water from this source was furnished by the Utah Lake Land, Water and Power Company and by its successor, the Utah Valley Land and Water Company, through an irrigation system owned by that company. During the time it provided this service, the Utah Valley Land and Water Company owned considerable land, including the land here in dispute, which it

purchased from Lewis Thompson and Theodora M. Thompson, his wife, on February 26, 1920.

The Utah Valley Land and Water Company became defunct, the land which it had purchased was the subject of a foreclosure sale by the First Security Bank of Provo and was purchased by that Bank. The certificate of sale is dated November 21, 1933. This certificate was assigned to the Colorado Development Company on August 3, 1934, and the Sheriff's deed pursuant to the foreclosure was issued in favor of the Colorado Development Company on August 15, 1934. Thus it appears that the land and the water project were completely separated at that time.

The Colorado Development Company quitclaimed to Penrod, November 27, 1937. On January 11, 1938, Penrod quitclaimed to the Commercial Bank of Spanish Fork—a defendant in this suit that did not plead. This deed was not recorded until December 29, 1944. Plaintiffs got their title from this bank on March 29, 1945, by quitclaim deed. These dates should be kept in mind in the discussion of the estoppel. As it is conceded that the tax title of defendants was fatally defective, plaintiffs' title would be good as against these defendants unless there is merit to the estoppel.

Returning now to August 16, 1934, when the Colorado Development Company acquired the certificate to the land on foreclosure sale and the irrigation project and land became separated in their paths of title, we find that nothing appears to have been done thereafter, officially, about the irrigation system, except that interested persons in the area—farm owners—administered the water system as best they could to provide themselves with irrigation water. It is well to mention right here that the particular land described above as in controversy, was not part of the irrigable land, although it was sold for taxes along with the rest.

The attempt to administer the irrigation system, as indicated above, was unsatisfactory and as a result a series of public meetings were held to see what course of action should be taken. Taxes on the land purchased by assignment of foreclosure certificate from the First Security Bank of Provo to the Colorado Development Company had not been paid since 1931, and the land had been sold to Utah County under the tax procedure mentioned above, and the purchase of the land from Utah County by sheepmen for grazing purposes appeared imminent. The chief interest of the residents of Elberta appears to have been the protection of the irrigation system and water supply. However, it appears that they were also interested in acquiring the land which had been subject to the tax sale, particularly that part of the land which was irrigable.

The minutes of four of the public meetings which were held, were admitted in evidence and are before us on this appeal. Their admission is assigned as error—as admitting hearsay evidence. The defendants were not present at any of the meetings. Some of the plaintiffs, that is, P. P. Thomas and Max Thomas, were present at part of the meetings but not all. There is nothing to show that any other of the plaintiffs were present at the meetings. More will be said as to this assignment of error later.

At the meeting of September 21, 1937, O. A. Penrod reported that he had a bid in to buy the Elberta Project, also the money to buy said project, and at this meeting Penrod was elected chairman of a committee with authority to purchase this project.

The minutes of the meeting of November 21, 1937, reveal that Penrod reported as follows (November 27, 1937, was the date of Penrod's deed from the Colorado Development Company) :

"Contacted County Commissioners, Mr. Johnson said to tell the people they would not sell to an individual such as a person wanting it for sheep range.

Can give clear title to all land the County owns. Bank will let go of their holdings for $2500. That means Reservoir and canal. What land they now hold."

After some further discussion the minutes of the meeting reveal that: "Penrod again stated Flume and Reservoir or project could be bought for $2500 cash and it would be in the clear."

At this meeting the powers of Penrod and his committee were restricted to that of an "investigating committee" rather than a "purchasing committee."

At a meeting held December 8, 1937, Penrod made a report to the effect that he had tried to interest various people in helping salvage the project but without success. That he had called the meeting after finding out that the "company holdings could be bought for $2500." He also indicated that the committee had met with the Utah County Commission asking about the delinquent tax lands and that the Commission informed the committee that they would sell the land for two dollars per acre and that there were about twenty-two hundred acres for sale at that price. He then went on to explain that the committee had become inactive and that he was left to work alone, and that before he had the answer to his bid for the project, his committee had been changed to an investigating committee, "so as my hands were tied to act for the people I acted alone, and took the option myself. All the company holdings are in my name but I am more than willing to deal with the people here and let them have what I bought for the same price of twenty-five hundred dollars plus what little expense was attached."

Two of the county commissioners were present at this meeting, and one spoke affirming that the land was for sale at two dollars per acre, that others, especially sheepment, were interested in purchasing it, but that the commission would prefer dealing with the local people instead of

outsiders. He is reported further to have said that it was the duty of the commission to secure the redemption of the tax lands, and they were not working against the people. The other commissioner confirmed what had been stated by the first commissioner and added that the commissioners were only performing their duty in trying to dispose of the delinquent tax lands regardless of where they are.

Mr. Thomas of the Bank at Spanish Fork (P. P. Thomas apparently) then spoke, saying that Penrod had tried to interest the bank in the project and that the bank had a piece of property in Elberta, but that the bank was not interested in the land here but would be if the people would get together and organize some sort of irrigation committee. He also indicated that Penrod had borrowed the money to purchase the project from the Spanish Fork Bank, and had paid most of it back. The period which elapsed between the purchase and this meeting was only some eleven days.

Penrod is reported as having stated that he had the best interests of the people at heart in doing what he did, and that if the people did not want to take his proposition, they should let him know "as he could double his money in 24 hours, but he wanted the people to have first chance."

The minutes of the meeting of December 11, 1937, reveal that Mr. Thomas spoke as a representative of the Bank from which Penrod borrowed his money, also as a property holder. (P. P. Thomas again apparently.) He is reported to have said that the Bank is now interested in getting things running so that it can sell the land owned by it.

Mr. Max Thomas (a party plaintiff in this suit) was present at this meeting and commented to the effect that what the people wanted to organize was a corporation.

Penrod apparently attended this meeting and declined a position on the committee selected to complete the organization, since he was the one with whom the committee would have to deal for the purchase of the project.

On November 27, 1937, the date of his quitclaim deed from the Colorado Development Company, Penrod also received a quitclaim deed from the Utah Valley Land and Water Company reciting the following: "All the reservoirs, dams, canals, flumes, ditches, laterals, rights-of-way and easements of every nature and kind, and all water and water rights, whether attached to lands or otherwise, comprising the irrigation system formerly owned by Utah Lake, Land, Water and Power Company and conveyed to the grantor herein at the time of its incorporation, and all other property of like nature thereafter acquired by the grantor."

The quitclaim deed from the Colorado Development Company of the land in controversy included considerable other land, formerly owned by the Utah Valley Land and Water Company, all of which had been the subject of the tax sale to Utah County.

Two other exhibits were admitted in evidence having a bearing upon the course of conduct in relation to the purchase of the project. They are:

1—Exhibit "J" which states that:

"As a basis for adjusting the water rights on the Elberta Project and securing the title to the reservoir, canals, flumes and other diversion works of the project, it is hereby proposed:

\* \* \* \* \* \*

"2. That O. A. Penrod convey to the corporation all rights, title, and interest that he may have to the project.

"3. That certificates of shares be issued to all persons who can establish a good title to the water in the project in consideration of the conveyance of such water rights to the company and O. A. Penrod shall receive

for his water sufficient shares to make the total amount equal to 7000 shares.

* * * * * *

"It is further understood that the sum of $3500.00 shall be paid to O. A. Penrod for the project which he had heretofore purchased and that said money shall be repaid by levying an assessment upon all the water stock issued, including such water stock as shall be conveyed to O. A. Penrod."

2—Exhibit "K" which is a draft of an agreement of the "Elberta Water Users Incorporation." This agreement was never executed, but according to the memorandum decision filed by the trial court in this case, is a further circumstance showing that Penrod regarded his purchase of the property for the benefit of the people. Nowhere does there appear any specific reference to the realty. Among other things this exhibit provides as follows:

"Whereas, the Utah Valley Land & Water Company, the corporation which has heretofore owned the water system and served the water users in connection with the Elberta Project in Utah County, State of Utah, is now defunct and its corporate charter has been revoked by the Tax Commission of the State of Utah, leaving the said Elberta Project in an unorganized condition, and

"Whereas, the First Party [Penrod] has bought all of the right, title and interest of the said Utah Valley Land & Water Company in and to the said water system, and now owns the same, and

"Whereas, Second Parties, either own land and water rights in the said Elberta Project or desire to acquire same, and

"Whereas, much of the land located in said Elberta Project has gone to tax deed and is now owned by Utah County and the County Commissioners of said County are desirous of selling said lands back to any of the parties to this agreement and others desiring to make their homes on said Elberta Project, upon the most reasonable terms possible, and

"Whereas, it is felt by all of the parties to this agreement that the Elberta Project water users should immediately organize a water company under the laws of the state of Utah in order to preserve their mutual interests and protect their respective water rights and more efficiently serve the farmers in the irrigation of lands located upon said Elberta Project, and

"Whereas, the First Party is desirous of conveying to said water company, as soon as its organization is completed, all the right, title and interest recently purchased by him in the said Elberta Project water system;

and all of the parties to this agreement are desirous of conveying to said water company, as soon as its organization is completed, their respective water rights in said Elberta Project in exchange for water stock in said water company, upon the terms and conditions hereinafter set forth.

"Now, Therefore, in consideration of the mutual promises between First Party and Second Parties, and the mutual promises of all of the parties hereto with each other, it is hereby agreed as follows:

\* \* \* \* \* \*

"2. That as soon as the said water company shall come into legal existence, the First Party shall convey to it all of his right, title and interest in and to said Elberta Project water system, including the Utah Valley Land & Water Company filing for appropriation of water \* \* \*."

Ultimately the people incorporated the Current Creek Irrigation Company, and the water project was turned over to that corporation by Penrod upon payment to him of the agreed purchase price, which sum was raised by assessment on the water stock. This was done in accordance with his offer to the people at the meeting of December 8, 1937, and conforms to the people's understanding of the situation as indicated in exhibits "J" and "K" quoted above.

The defendants purchased the tax title to the disputed land from Utah County. The memorandum decision of the lower court seems to cast some doubt on the ■ consideration for the deed from Penrod to the Bank of Spanish Fork, and from the Bank of Spanish Fork to the plaintiffs. There is, however, a presumption of consideration, 16 Am. Jur. p. 653, and there appears in the record not one word refuting the adequacy of the consideration. The deeds, making plaintiffs' chain of title including this one, were admitted in evidence without objection, and the question of adequacy of consideration, or that the instrument was other than a deed was never raised.

On June 3, 1940, a committee of Elberta Residents, consisting of Valeria Bauer, James Patten, James Mikkelson and Earl Barney and his wife (parents of Oren Barney) met with the county commission to prevail upon the commission to refrain from selling any more land until there

was an opportunity to determine whether there might be water rights on some of the land which had not yet been sold by the County. Penrod was present at this meeting, although he was not a member of the committee. Valeria Bauer, testifying on behalf of the defendants, and Earl Barney, also testifying on behalf of the defendants, stated the substance of what Penrod said at that time. These statements constitute the substance of the estoppel pleaded. They are assigned in error as hearsay and their admission as erroneous. We quote them:

### Mrs. Valeria Bauer:

"Q. Will you advise the court what if anything was said by you and what was said by Mr. Penrod? (Objection—overruled) A. At that time I was appointed as chairwoman to meet with the commissioners in regard to some land we was trying to stop the sale of and Mr. Penrod asked me what lands we proposed stopping the sale on, and as I remember I answered him, 'Those which we think the water rights might be good on, and we would like to have them investigated before any more sales are made.' (The land in controversy was not irrigable.)

"Q. And did Mr. Penrod make any answer at that time? A. Mr. Penrod answered me—I have the minutes exactly as he answered me at home, but I don't happen to have them with me today. (Objection)

"Q. You may proceed. A. He stated to me that he and his partners, or workers, I don't know just how he stated it, that was working with him, had all the land that they now desired; that all those with water rights had been taken care of, and if the people so desired they could have all that remained."

### Mr. Earl Barney:

"Q. On the occasion of your meeting with the committee and at the time the committee met with the board of county commissioners, you state that you saw O. A. Penrod? A. Yes.

"Q. Was he at the county commision rooms? A. He was in the main room of the county commission where we was holding the meeting.

"Q. Did Mr. Penrod make any statement on that occasion? A. Yes.

"Q. Will you advise the court what he said? A. Yes.

\*  \*  \*  \*  \*  \*

"Q. What did Mr. Penrod say and to whom did he say it? A. Well, he asked the committee there what land we was asking for, and we told him, and he said, 'Well, we have got all the land we want,' and, he said;

'You can have all there is left. Go ahead and buy all there is left if you want to.' He said they had already bought all the land they wanted, if there was any left we could have it all."

Cross examination:

"Q. Isn't it a fact that this committee went to the county commissioners to get the county commissioners to not sell any more land with water rights? A. I believe that was the purpose of the meeting.

"Q. That was the purpose of the meeting, wasn't it? A. Yes, I think so.

"Q. And Penrod then said he had bought all the lands he wanted? A. Yes. And I said, 'What about this land above the canal?' And he said, 'Oh, we ain't interested in that and never was.'"

Oren Barney was a former resident of Elberta. During the years 1932 to 1940, however, he resided away from Utah, but corresponded with his family who continued to live in Elberta. His father, Earl Barney, was a member of the committee to whom Penrod made the statements upon which defendants rely for an estoppel. Oren Barney testified in his own behalf to the effect that he had been interested in purchasing land around Elberta since it was sold for taxes, and that during 1940 he had sent his father money to buy certain land, which land, however, Penrod apparently had already purchased, and refused to give up. Thereafter, he came to Utah and purchased certain land with water rights near Elberta, on November 13, 1940. This property has nothing to do with any land sold by Utah County for taxes. He went to the county commission accompanied by his wife and father, and there examined the properties that had been sold to Utah County for taxes, and had not been disposed of by Utah County, and made his selection of the land described earlier in this opinion as the land in controversy. He purchased the land under contract, and received a quitclaim deed from Utah County, November 3, 1941, after having completed payment of the purchase price. He testified that his father had communicated to him the statements made by Penrod on the occasion of the meeting with the County Commissioners, al-

though he did not testify as to just what his father had told him. Oren Barney went into possession of the land purchased from Utah County, and ran cattle thereon.

From the lower court's memorandum of decision we get his ideas of the facts we have set out above. We quote from that memorandum:

"The pleading and the evidence to support it, in the second affirmative defense of the defendants, in substance, is to the effect that Penrod bought the lands from the Colorado Development Company; that the Commercial Bank of Spanish Fork by P. P. Thomas, its president, advanced the purchase money; that both agreed to convey to the users of water the lands purchased upon the water users' payment of $2500, which payment the water users made, and that as some of such water users the defendants became entitled to the conveyance. This is simply a promise unfulfilled and nothing more. There are none of the elements of equitable estoppel either alleged or proven in this defense. Thus while the facts are found as alleged, they are not sufficient to entitle the defendants to judgment quieting title. While the facts are set up as an estoppel, the action on this cause is in contract.

"However, even a cursory reading of the facts found by this court and the authorities cited and quoted, makes it clear that O. A. Penrod held the legal title to the lands in question. That Hanson and the two Thomases, members of plaintiff partnership, were at all times dealing with Penrod, with the people of Elberta, and with the county in respect to these lands and had bought some of them from the county, *that Penrod, while having the legal right to these lands, represented to the answering defendants that he had the present intention of abandoning such right,* and that he and his associates had bought all the land that they wanted, and that the people could buy the rest; that the statements and conduct of Penrod was calculated to induce these defendants to act. thereon; *that acting upon this representation the answering defendants purchased the lands in question from the county by contract and made the payments thereunder, finally receiving the county's deed.*

"Under these facts, it could be stated as in the case of *Fried* v. *Fisher,* supra [328 Pa. 497, 196 A. 39], the doctrine of promissory estoppel peculiarly applies.

"The further question now arises as to whether such estoppel binds members of the plaintiff partnership who are not shown to have actual knowledge of the facts."

(Italics added. The italicized statements are some of the questionable conclusions as will be seen hereafter.)

The appellants assign the following alleged errors, which they argue under three point headings:

1. The court erred in denying plaintiffs' motion for a dismissal of defendants' counter-claim and for judgment in favor of plaintiffs.

2. The findings of fact are not supported by the evidence.

3. The findings of fact do not support the conclusions of law.

4. The findings of fact and conclusions of law are insufficient to support the decree.

5. The court erred in admitting hearsay testimony and other inadmissible evidence on the part of the defendants over objections of the plaintiffs.

Respondents attack the assignments as being insufficiently specific to show wherein there was error. The assignments are very general, and particularly the 5th assignment; but in view of our recent change to practice under court rules of procedure, we shall not discuss this matter further.

Appellants' first point argued deals with the admission of evidence of statements made by O. A. Penrod, at the meeting with county commissioners on June 3, 1940; and also the minutes of that meeting. They attack this evidence as in violation of our statute of frauds; and as hearsay. To answer this point one must keep in mind the issue involved. Respondents' defense involving this point is not that Penrod or the plaintiffs, have acquired a title to property which should have gone to, or been conveyed to, defendants; but is that of representations made which induced defendants to purchase a tax title and therefore plaintiffs are estopped to question the validity of defendants' tax title. Such an issue does not raise any

question that calls for the application of the statute of frauds. The statements are not offered, under such a defense, to prove the truth of those statements; but merely to prove they were made as the inducement to defendants' purchase, be they true or false. As such, they are not hearsay. *Parry* v. *Harris*, 93 Utah 317, 72 P. 2d 1044, and *Golden* v. *American Keene Cement & Plaster Co.*, 98 Utah 23, 95 P. 2d 755.

The admission into evidence of the minutes of the public meetings held in September, November and December, 1937, are also attacked as error. Of these minutes, all except those of the September meeting were kept by Mrs. Valeria Bauer, whose testimony qualified them for admission. The September minutes were taken down by another, who turned them over to Valeria Bauer, but she was not present at that meeting. While the minutes of this meeting might be attacked as hearsay, the appellants have not been prejudiced by them, and in view of the holding of this court, the matter need be considered no further.

Appellants second point—that the findings of fact are not supported by the evidence—is the important question in this case. Possibly there is some confusion of names in the record; but, the defendant, Oren Barney, is not the Barney who attended the meeting of June 3, 1940. He was not present when O. A. Penrod made any statements that are claimed to have induced him to make the tax title purchase. Furthermore, it does not appear that any of the plaintiffs knew that Oren Barney was purchasing the tax title, or knew that Penrod had made any statements regarding the property, and it is clear that Penrod did not represent the bank or the plaintiffs in making such statements. Oren Barney's knowledge of what Penrod said came to him through his father, Earl Barney. The latter was present at the time those statements of Penrod's are alleged to have been made. He acknowledged on cross ex-

amination that he knew that Penrod had, prior to this time, been purchasing tax titles, and that he didn't think Penrod in making the statements attributed to him meant that the people could buy land that he owned.

The lower court's findings number 15 and 16 are the ones particularly defective in this respect. Those findings read:

No. 15:

"That after the purchase by O. A. Penrod from Utah County of the lands formerly irrigated and while he was the record owner of the lands in issue O. A. Penrod on June 3rd, 1940, informed a committee of residents from Elberta and vicinity that waited upon the Utah County Commission that he and his associates had bought all the land from Utah County they wanted and that the people living in and about Elberta could go ahead and buy from the County the balance of the land that had been sold to him by the Colorado Development Company and which had been sold to Utah County for non-payment of taxes.

"That in reliance upon the statement and representation of O. A. Penrod defendants, Oren E. Barney and Thelma Barney, purchased the land in issue under a contract from Utah County and upon payment of all partial payments received deeds from Utah County. That O. A. Penrod aided defendants in making their selection of the land purchased by defendants from Utah County."

No. 16:

"That P. P. Thomas, Max Thomas and Joseph Hanson, members of plaintiff partnership, were at all times between December 11th, 1937, and the time the land was deeded to plaintiffs, as partners, dealing with O. A. Penrod, with the people of Elberta and with Utah County in respect to the lands in issue. That the statement of O. A. Penrod on June 3rd, 1940, to the committee from Elberta at the meeting with the county commission, and the conduct of Penrod was calculated to induce defendants to act thereon."

Oren Barney and Thelma Barney did not, however, rely upon anything Penrod said. Oren Barney testified that he had been interested in purchasing land in the vicinity ever since he knew that it was up for tax sale, and that he tried to buy some land in Section 30, which was to be sold for taxes, prior to the purchase of the tax title to the land in controversy. The record dis-

closes that he had been informed by his father, while he was residing in Arizona, that the land was up for sale by Utah County, and he was interested at all times in purchasing the tax title of the county, without regard as to who held the record or fee title. He, along with practically everyone else in the area, including Penrod apparently, thought the county had good title to the land. This belief to a large extent was engendered by the respresentations made by the County Commissioners at the public meeting of December 8, 1937, to which reference has previously been made. Certainly there is nothing in the record to show that Barney, or anyone else, relied upon the fact that Penrod ostensibly had the fee title and was waiving his title in favor of the purchaser of the county tax title. Nor is there evidence in the record to justify the belief that the statements of Penrod were calculated to induce these defendants to buy. When Penrod made those statements, he did not have title to the property in question, and had in fact been purchasing tax titles in derogation of the record title after his conveyance to the bank. His statements should be viewed in the light of his belief that title was in the county. What interest he had acquired by quitclaim deed, he had conveyed away to the Bank some 2½ years earlier. The statements made, and the facts surrounding them as they actually existed, according to the record, do not indicate any waiver of an existing right in the property in controversy.

The latter part of finding number 15, as follows, is also without support in the record: "That O. A. Penrod aided defendants in making their selection of the ■ land purchased by defendants from Utah County."

Defendants went with Oren Barney's father, Earl Barney, to make the purchases, not with O. A. Penrod.

After having carefully reviewed the record, we are forced to conclude that appellants should prevail upon this point.

Point three raises the question of whether or not the findings of fact support the conclusions of law. Having held that the findings of fact are fatally defective, it is unnecessary to decide this point.

The decree of the lower court is reversed and the case remanded for a decree quieting title in the plaintiffs as to the land in controversy, subject to plaintiff's stipulation in his amendment to reply to amended answer and counterclaim as to return to defendants of the amounts paid Utah County by the defendants.

As there were other lands involved in which defendants disclaimed any interest, a decree should be entered quieting title as to that land as against defendants, as well.

Costs to appellants.

WOLFE and McDONOUGH, JJ., concur.

LATIMER, Justice.

I dissent.

In view of the fact that I disagree with some of the statements made in the prevailing opinion with respect to the chain of title of the land and water I deem it advisable to set up the history of plaintiffs' and defendants' titles.

The parties agreed that title to both the land and water was vested in the Utah Valley Land and Water Company, it having acquired the property on the 26th day of February, 1920, by deed from Lewis Thompson and Theodora M. Thompson, his wife. That company mortgaged the property to the First Security Bank of Provo, a corporation; payments became delinquent and the mortgage became in default; foreclosure proceedings were instituted; and, on November 21, 1933, the sheriff's certificate of sale was issued. On August 3, 1934, the First Security Bank of Provo assigned the certificate of sale to the Colorado

Development Company and on the 16th day of August, 1934, a sheriff's deed was issued in which that company was designated as the grantee. The deed included the ditches, laterals and water rights of every nature used on or belonging to the lands.

On the 27th day of November, 1937, the Colorado Development Company, by quitclaim deed, transferred the land and water rights to O. A. Penrod. On the same date and apparently to remove all doubt as to the title to the water system Penrod obtained a quitclaim deed from the Utah Valley Land and Water Company to the reservoirs, dams, canals, flumes, ditches and easements of every kind and nature and all water rights previously owned by that corporation. It thus appears that on November 27, 1937, Penrod had obtained the record title to all of the lands, water, and water system involved in or incidental to this litigation. On the 11th day of January, 1938, Penrod by quitclaim deed conveyed his interest in and to the real property to the Commercial Bank of Spanish Fork. It should be noted at this point that while Penrod conveyed his interest on the date mentioned, the deed was not placed of record until December 29, 1944, and that until that time the county records and tax notices would show that he was the legal owner of the property. Moreover, during that seven year period neither Penrod nor the bank ever disclosed that the conveyance had been executed. The Commercial Bank of Spanish Fork, together with other grantors, conveyed the real estate to plaintiffs on the 29th day of March, 1945.

On the 16th day of December, 1939, Penrod conveyed his interest in the water and irrigation system to the current Creek Irrigation Company pursuont to a plan discussed and recommended to the residents of the Elberta area by Penrod and plaintiff P. P. Thomas. Apparently, the water and the irrigation system are still owned by that irrigation company.

The defendants obtained their title to the particular property in controversy on November 3, 1941, by purchasing tax titles from Utah County. The record shows that they obtained two other parcels of land in that district; one parcel of 29 acres was obtained from Robert E. Clemants and wife on the 13th day of November, 1940; and another 40 acre tract was acquired on July 30, 1943, from James H. Mikkelson, who was an active participant in the meetings out of which the reorganization was effectuated.

In considering the facts of this case and the principles I discuss, it should be kept in mind that I believe, contrary to plaintiffs' contention, the property with which the Elberta people were concerned was both the irrigation system and the lands. Apparently, a satisfactory arrangement was made to distribute the water and revest title to the irrigated property. The question left for determination does not deal with either of those but involves land which was above the level of the irrigation system and which could not be irrigated. The relevancy of the testimony dealing with the irrigated properties and the irrigation system is to show the relationship of the parties, the nature of the transaction, the reasons the people of the community were led to believe that Penrod was acting in a fiduciary capacity, and, finally, why transactions such as this for acquiring title to the land without water are not separate and isolated from the overall community venture. If each transaction was separate and distinct we might be confronted with a different principle than is presented here where a person seeks to profit several ways from a single enterprise.

Now as to the merits. Some time during the year 1937, the residents of Elberta began holding mass meetings in an effort to save their property and protect their homes. The Utah Valley Land and Water Company was defunct, the Colorado Development Company was apparently not ser-

vicing the residents of the community, the water system was in a bad state of repair, the water was being distributed by property holders, part of the property had gone to tax sale for the 1931 taxes, and it was necessary that some action be taken to protect or reacquire the lands and water rights of the citizens of that community.

Previous to September 21, 1937, O. A. Penrod had been appointed chairman of a committee to investigate the means of dealing with the critical situation. For reasons not disclosed by the record, the committee failed to function properly and so on November 27, 1937, he purchased the lands and water and had himself designated as grantee in the deeds. He also contacted the county commissioners of Utah County about perfecting his title by purchasing tax deeds. On September 21, 1937, at a meeting held in the Elberta Ward Stake House, Penrod reported to an assembled group of property owners that he had submitted a bid to purchase the Elberta project. The scope of the discussion was such that it is apparent the project involved both land and water. He had obtained both and the conversations encompassed both. On December 8, 1937, Penrod again reported his activities to the group at a community meeting and he stated in substance that he had tried to interest other parties and other committeemen in working out a project but his hands had been tied in acting for the people, so he had acted alone and purchased the property. When he was accused of acting against the best interests of the other residents he vigorously insisted he was acting for their benefit and to protect their interests. He reported he paid the sum of $2,500 and that while he had taken title in his own name he was willing to protect the people and permit them to purchase the property for the sum he had invested plus a few dollars of expense money. The county commissioners of Utah County were present at the meeting and one of them explained the procedure for re-purchasing the property and stated that it could be

redeemed for the sum of $2 per acre. At the same meeting Mr. P. P. Thomas, who is one of the plaintiffs in this action, took an active part in the discussion, verified Penrod's statements and stated that he, Thomas, was not interested in the land but if the people would show some interest and form an irrigation district perhaps the bank of which he was an officer and director might become interested enough to advance some funds.

At a subsequent meeting on December 11, 1937, plaintiff P. P. Thomas suggested that an irrigation company be formed, explained the necessary steps for its formation and stated that in view of the fact that Penrod had acquired the company holdings (apparently referring to the Colorado Development Company, as successor to Utah Valley Land and Water Company) that the committee deal with him. Penrod was present at this meeting, participated in the discussion and withdrew as a committee member because title was in his name and it would be necessary for the committee to deal with him.

As a result of these discussions, it was concluded by the majority of the citizens that an irrigation company should be formed to own the irrigation system and distribute the water. This was subsequently accomplished. The water system was transferred to the company and the stockholders were assessed to make a payment of $3,500 to Penrod. Apparently, this sum was paid to him in consideration of his executing a deed to the water system to the Current Creek Irrigation Company. If the reports made by Penrod were accurate, the $3,500 amount paid was in excess of the sum invested by him for both the land and water as he originally claimed $2,500 as the amount expended, and the deed for the water system shows a consideration of $100, while the deed to the property shows a consideration of $2,000.

On June 3, 1940, a committee of Elberta residents met

with the County Commissioners of Utah County in regards to working out an arrangement for purchasing title to the land which had been sold for failure to pay taxes. Penrod was present at that meeting and after discussing the dilemma he stated that he and his partners had all the land they desired, that the lands with water rights had been disposed of, the water company had been reorganized, and if the people of the district desired they could purchase from the county all the remaining property. He further stated that he and his associates were not interested in any of the land above the canal and it would be proper for the land owners to acquire all that was left. In view of the fact that his deed to the bank had not been recorded at the time of this meeting, the record title to the land under discussion was in him and it is a fair assumption that all parties considered that he or the county was the true owner of the property. After this conversation, purchases, including those made by the defendants, were made of the unirrigated properties.

There are a number of exhibits and testimony adding weight to the theory that Penrod was acting as a trustee for the benefit of the residents of that community. I do not refer to all of the exhibits or relate all of the testimony for the reason that the majority opinion reverses the trial court on the grounds that plaintiffs were bona fide purchasers for value without notice and that the defendants were not misled by statements of Penrod. That holding only requires that I state sufficient evidence to sustain the trial judge's contrary findings.

The first question concerns whether plaintiffs are bona fide purchasers of the property for value without notice of defendants' claim and as such cut off any equitable rights the defendants might have. The trial court found that they had notice and the majority opinion takes issue with this. I am of the opinion that the trial court's finding is appropriate and the majority opinion in error.

The record does not disclose when the plaintiff partnership, Elberta Land and Water Company, was formed. The first affidavit for doing business under an assumed name indicates that it was formed prior to March 3, 1945, and it was shortly after that date that the propery was conveyed to it. At that time P. P. Thomas, Joseph Hanson, Charles H. Dixon, and Max Thomas, together with others, were members of the partnership and the first two were grantors in the deed. Those four parties actively participated in the reorganization of the water company and in the transactions dealing with the attempts of the residents of Elberta to save their property. P. P. Thomas was an officer of the Commercial Bank of Spanish Fork, advised the residents as to methods of procedure, was an active participant in all of the transactions, and he had full knowledge of the relationship between the bank, himself, the partnership, Penrod and the landowners. Approximately 30 days before Penrod executed the deed to the bank of Spanish Fork P. P. Thomas reported to the property owners that Penrod was the owner of the property and that all transactions should be carried on with him. The record does not indicate that at any time thereafter he ever notified any person that the property had been conveyed to the bank and that Penrod was divested of his interest. If the deed was delivered on the date of its execution it was held unrecorded by the bank for a period of approximately seven years. The plaintiffs did not receive their tax title to the property until 1941 and so there was a period of at least three years in which the bank could have charged defendants with notice of its claimed interest and cast upon them the duty to determine its interest.

While the three other members of the partnership were not so well informed as to all details they had sufficient information to charge them with the duty of inquiring into the rights of parties in possession of the property and those who might have acquired rights between 1937 and

1945. The partnership did not acquire title from the bank until that year and defendants had been in possession of the property for at least four years prior to this date. Moreover, P. P. Thomas and Joseph Hanson had some undisclosed interest in the property as they joined in the conveyance as grantors. They, in effect, were both grantees and grantors and they cannot escape the claim that they had notice of the equities.

I am likewise of the opinion the trial judge was correct when he ruled that plaintiffs were not purchasers for value. The majority opinion claims the deed presumes consideration and that there is no evidence in the record to overcome the presumption. The evidence I find and the inferences I make lead to a contrary conclusion. The testimony suggests that Penrod borrowed the money from the bank to make the original purchase from the two companies and that the bank was not interested in buying any land in that area. If such is the case, then it is a reasonable inference that the deed was to secure the repayment of that loan and therefore was, in fact, a mortgage. This conclusion is further strengthened by the deeds and the articles of incorporation of the Current Creek Irrigation Company. It appears that the residents of Elberta were notified that the money had been borrowed from the Bank of Spanish Fork and that an assessment would be necessary to repay at least part of the loan. This information came from both Penrod and an officer of the bank. The assessment was levied, the loan was repaid and no one claimed any other or different consideration for the execution of the deed. In addition to that, an inspection of the instruments in the record shows that in all instances involving deeds United States revenue stamps were placed on all instruments except the two quit claim deeds, the one from Penrod to the bank and the other from the bank to plaintiffs. As I understand the federal requirements, an internal revenue stamp must be placed on a deed prior to re-

cording if the consideration equals $100. Recording of the instrument without a stamp would be a circumstance which could be considered in determining whether the deed was given for a valuable consideration.

In disposing of the first two issues, I would hold that there was evidence to sustain the trial court's findings that plaintiffs had actual notice of the equities in favor of pur-chasers of the tax titles and that they were not purchasers for value.

The most difficult question hinges on whether plaintiffs can be estopped from claiming defendants' title invalid because of plaintiffs' claim that the representation did not relate to a present fact. I concede that the doctrine of promissory estoppel should only be applied in exceptional cases, but I believe this is one which calls for the application of that rule. If the plaintiffs can question the legality of defendants' title in this instance then all property owners who purchased land from the county under the proposed reorganization plan stand likely to lose their property. If the question can be raised against one purchaser it can be raised against all and grave injustice will result.

It is a generally accepted rule that in order to furnish the basis for an estoppel the representation or assurance must relate to some present or past fact as distinguished from mere promises or expressions of opinions as to the future. The reason on which the doctrine of estoppel rests largely fails when the representation relates only to the present intention of a party.

That broad rule has certain exceptions and it has been narrowed by certain cases in which an estoppel has been predicated on promises as to future conduct. According to the doctrine of "promissory estoppel" an estoppel may arise from the making of a promise, if it was intended that the representation should be acted upon, and the refusal

to enforce it would create an injustice. The following statement of the principle is taken from paragraph 53, Estoppel, 19 Am. Jur. 657:

"The doctrine of 'promissory estoppel' is by no means new, although the name has been adopted only in comparatively recent years. According to that doctrine, an estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice. Promissory estoppel is sometimes spoken of as a species of consideration or as a substitute for, or the equivalent of consideration; but the basis of the doctrine is not so much one of contract with a substitute for consideration, as an application of the general principle of estoppel, since the estoppel may arise, although the change of position of the promisee was not in any way an inducement to the promise and was not regarded by the parties as any consideration therefor.

"The doctrine of promissory estoppel is most widely recognized and most frequently applied in cases of promises or representations as to an intended abandonment of existing rights. Some courts have even stated that these are the only cases in which promises as to the future may be the basis of an estoppel. The better-considered statements of the doctrine, however, do not contain this limitation, and the courts have actually applied the doctrine in numerous instances which could not fairly be said to involve an abandonment of an exisiting right."

## Volume 31, C. J. S., Estoppel, § 80, p. 289, states the doctrine in the following language:

"The doctrine of estoppel by representation is ordinarily applicable only to representations as to facts either past or present, and not to representations or promises concerning the future which, if binding at all, must be binding as contracts.

"Notwithstanding the unanimity of the courts with respect to the preceding statement as the statement of a general rule, representations as to the future or promises have been enforced or permitted to operate as a basis of an equitable estopple if to do otherwise would help perpetrate a fraud or cause injustice in a case where the representation or promise has been made to induce action or is reasonably calculated to induce action and has in fact induced action on the part of the party setting up the estoppel. This exception has come to be known as the doctrine of promissory estoppel. In such cases it is held that the party making the promise is estopped to assert lack of consideration therefor. Of course, a promise cannot be the basis of an estoppel if any other essential element is lacking.

"The most frequent application of the doctrine permitting a promise or representation as to the future to raise an estoppel has been said to be the well recognized exception to the general rule presented where the statement relates to an intended abandonment of an ,existing right, and is made to influence others who have in fact been influenced by it, where substantial injustice will result unless the promise is enforced. It has been said that this is the only case in which a representation as to the future can be held to operate as an estoppel."

The doctrine I quote above was referred to with approval by this court in *Elliot* v. *Whitmore,* 23 Utah 342, 65 P. 70. I quote from page 354, 25 Utah Reports, page 74 of 65 P.:

"Even taking these conversations in the most favorable view for appellant, there was absolutely no statement upon the part of the defendants of an intended abandonment .of an existing right. * * * it has frequently been held that an estoppel will not arise ·simply from a breach of promise as to future conduct, or from a mere disappointment of expectations. The only case in which a representation as to the future can be held to operate as an estoppel is where it relates to an intended abandonment of an existing right."

The facts which I believe bring this case within the quoted authorities are these: During the year 1937 Penrod participated along with the residents of Elberta in their attempts to reacquire the water and lands of that district. He originally operated as a member of the committee, but when the members failed to perform in accordance with his desires he purchased the land and water. He notified the residents of that community that the property had been purchased by him for their benefit and that he was the owner of the same, subject to their rights to repurchase at his cost. Throughout all the dealings it was represented to the Elberta residents that Penrod was the owner of all the properties previously held by the Utah Valley Land and Water Company and the Colorado Development Company, and up until the time these defendants purchased the property no contrary information had been furnished to anyone connected with the project. The county records were such that any party dealing with the land was entitled to act on the belief that Penrod was the true owner. At the time of the meeting with the County

Commissioners on June 3, 1940, the county records indicated that Penrod was still the owner and even though a deed had been executed by him he represented that he and his associates owned and controlled the property and that they were relinquishing all rights they had in and to the property not then purchased. It can, of course, be argued that the title belonged to Utah County and not to Penrod, but if the tax proceedings were invalid, and the court so found, then the ownership never changed.

There are many reasons why the deed given by Penrod to the bank in 1938 did not divest him of title. As previously indicated, the transaction appears to have been a mortgage of the property and not a transfer, and the acts and conduct of Penrod and P. P. Thomas, an officer of the bank, are consistent with that view of the deal. All parties were led to believe that Penrod was the owner and that any interest the bank had in the property was merely that of a secured creditor. Such being the case, when Penrod on June 3, 1940, in the presence of the citizens' committee made the statement that he and his associates had all the property they intended to deal with and that the other parties were free to purchase the remaining land, he made a promise intending that it should be relied upon. It was in fact relied upon, and to permit those claiming under him, when they were not bona fide purchasers for value, to escape its enforcement would result in an injustice. Penrod had the right, as owner of the property, to retain it. Yet, he represented to the people of that community that he intended to abandon that right and now those who associated with and claim under him seek to escape the legal effect of that representation on the theory that he could change his mind. I believe they should be estopped to so assert.

The last question to be disposed of is whether or not a representation, in order to be the basis for an estoppel,

must be made with intention, by the one who is to be estopped, that it shall be acted upon by the very person who claims the benefit of the estoppel.

A representation, in order to effect an estoppel, need not be made directly to the party acting on it. It is enough if it was made to another with the intention or expectation that it would be acted upon by him or any and all persons having an interest in the subject matter. Pomeroy's Equity Jurisprudence, Vol. 3, 5th Edition, paragraph 811, announced the following principle:

"It has frequently been said, in most general terms, that the conduct amounting to a representation, in order to constitute an estoppel, must be done with the intention, by the one who is to be estopped, that it shall be acted upon by the very person who claims the benefit of the estoppel, or, as is sometimes said, that it shall be acted upon by another person. In short, there must always be the intention that the conduct shall be acted upon either by some person, or by the very person who afterwards relies upon the estoppel. While such intention must sometimes exist, and while the proposition is therefore true in certain cases, it would be very misleading as a universal rule. In many familiar species of estoppels no intention can possibly exist. The requisite, as applicable to them is well expressed by an eminent judge: It is not 'necessary, in equity, that the intention should be to deceive any particular individual or individuals. If the representations are such, and made in such circumstances, that all persons interested in the subject have the right to rely on them as true, their truth cannot be denied by the party that has made them, against any one who has trusted to them and acted on them * * *. Where a man makes a statement in a manner and under circumstances such as he must understand those who heard the statement would believe to be true, and if they had an interest in the subject-matter would act on as true, and one, using his own means of knowledge with due diligence, acts on the statement as true, the party who makes the statement cannot show that his representation was false, to the injury of the party who believed it to be true, and acted on it as such; that he will be liable for the natural consequences of his representation, and cannot be heard to say that the party actually injured was not the one he meant should act.' This mode of stating the doctrine may in equity apply to every kind of estoppel, even to those by which an owner of land is precluded from asserting his legal title."

The representations in this case were such that all persons interested in the Elberta property could be reasonably expected to rely on them. Penrod made the statements in

a manner and under circumstances such that he must have intended that those who heard them would believe them to be true, would act on them and would repeat them to others who likewise would rely on them. He, therefore, cannot be heard to say that defendants were not the ones he meant should purchase the property.

The majority opinion concedes that there was evidence that the statement made by Penrod on June 3, 1940, was conveyed to the defendants. It goes without saying that a tax title is less vulnerable to attack if the owner abandons his right to the property, and, his representation to that effect was of importance to these purchasers.

WADE, J., concurs in the dissenting opinion of LATIMER, J.