2001 UT 8

**Loren CRANK, Jr., Plaintiff, Appellant, and Cross–Appellee,**

v.

**The UTAH JUDICIAL COUNCIL, Defendant and Appellee,**

and

**Lyle R. Anderson, Defendant, Appellee, and Cross–Appellant.**

**No. 990171.**

Supreme Court of Utah.

Feb. 6, 2001.

---

Eric P. Swenson, Salt Lake City, for plaintiff.

Ellen Maycock, David C. Wright, Salt Lake City, L. Robert Anderson, Daniel G. Anderson, Monticello, for defendants.

DURRANT, Justice:

¶ 1 Plaintiff Loren Crank, Jr., appeals the trial court's denial of attorney fees in his action to enforce a consent decree that required defendant Utah Judicial Council ("the Council") to revise its method for preparing master juror lists in the Seventh Judicial District, San Juan County, Utah. Crank also appeals the court's decision to strike his motion to find Judge Lyle R. Anderson in contempt for failure to implement the requirements of the same consent decree. Judge Anderson cross-appeals the court's denial of his motion for attorney fees.

## BACKGROUND

¶ 2 Crank initially filed suit in 1993, bringing claims under 42 U.S.C. § 1983 in state district court. He resides in Montezuma Creek and is an enrolled member of the Navajo Tribe. He brought the action on behalf of the class described as Navajo, Paiute, and Ute Native Americans in San Juan County.[1] His suit alleged discriminatory under-representation of Native Americans on juries in the Seventh Judicial District Court. The identified defendants in the action were the Council, which was responsible for preparing the master jury lists, and the three judges of the Seventh Judicial District Court.

¶ 3 The parties arrived at a settlement agreement (the "Agreement"), which was confirmed by the district court in the form of a consent decree in 1996.[2] In conjunction with its approval of the Agreement, the court

---

1. All references to Crank in our opinion should be read to refer to the entire class.

2. The Council also agreed to pay a specified amount in attorney fees to compensate Crank's counsel for his efforts in bringing and prosecuting the lawsuit up to the point of settlement.

dismissed with prejudice the actions against the individual judges of the Seventh District. It also retained jurisdiction for the purpose of monitoring and enforcing compliance with the Agreement.

¶ 4 The ultimate goal of the Agreement was to ensure more equitable representation of Native Americans on San Juan County juries. That goal implicated the entire jury selection process. According to practices established before Crank's original suit, the Council compiles a master list drawn from voter registration and driver's license lists. From this master list the Council randomly draws a specified number of names which comprise the "questionnaire list." The questionnaire list is sent to the district court clerk, who mails a questionnaire to each individual on the list for the purpose of ascertaining minimum jury service qualifications. After qualification has been verified, those individuals are eligible to receive summonses to serve as jurors in particular cases.

¶ 5 The Agreement required the Council to formulate a plan that would provide for "District Questionnaire Lists ... to the Seventh District Court [containing] on average, plus or minus, 5 percent of the estimated percentage of adult Native Americans in San Juan County in any given year." The target percentage was to be achieved "as soon as is reasonably practicable, and no later than January 31, 1997." This deadline was not absolute, however. Anticipating potential administrative difficulties, the Agreement specifically permitted the Council to petition the district court for an extension of time.

¶ 6 The Agreement did not define how the actual percentage of Native American adults living in San Juan County was to be measured. The only indication of a specific reference percentage was contained in an attached exhibit, which compared prior percentages of Native Americans included on prior jury questionnaire lists to the percentage of Native Americans residing in San Juan County as reported by the 1990 census figures. The 1990 census indicated that

51.68 percent of the adult residents of San Juan County were Native American.

¶ 7 The Agreement did not specify the method by which the target jury questionnaire list percentage was to be achieved. In San Juan County, 500 names are drawn from the master list to compose a questionnaire list.[3] With a random draw of a sizeable number of people, the proportion of any given identifiable group on the master list will, as a matter of statistical probability, approximate the same proportion of that group on the questionnaire list. Ideally, the master list should include all eligible adults residing in the district and produce representative proportions of Native Americans on the questionnaire lists. However, the Agreement did not describe how the questionnaire lists should be brought into compliance if, for any reason, a random draw did not generate a percentage of Native Americans within the designated range.

¶ 8 The Agreement included a number of monitoring requirements. The Council was required to file its plan with the district court within six months, and annual reports were to be submitted for the first three years. As with the other deadlines contained in the Agreement, however, the Council could petition the court for an extension. To the extent further disputes arose, the Agreement required the parties to "engage in reasonable discussions to resolve their differences informally," prior to re-instituting litigation. The Council was granted "reasonable discretion to undertake actions and implement policies" in furtherance of the Agreement's mandates.

¶ 9 The Council undertook implementation of the Agreement by conducting negotiations with representatives of the Navajo Nation. The two fundamental aspects of the Council's negotiations concerned establishment of a protocol for ensuring equitable representation of Native Americans on San Juan County juries and acquisition of an accurate list of adult Native Americans living within the territorial jurisdiction of the Navajo Nation. The Council encountered unanticipated difficulties in both aspects of its negotiations.

---

3. This figure is derived from the court's findings based on evidence presented at the December 1998 trial.

¶ 10 With respect to the comprehensive protocol, the Council's goal was to obtain an agreement encompassing all phases of the process by which Native Americans under the jurisdiction of the Navajo Nation would be identified and selected for jury duty and required to appear.[4] Approval of the protocol became more complicated than anticipated and had not been finalized even at the time of trial.[5] The Council remained in contact with Crank's counsel, but did not file its plan or any other reports with the court.

¶ 11 The Council's parallel attempt to obtain a useable list of eligible tribal members also met with complications. This list was intended to supplement the master jury list. By merging the tribal list with existing driver's license lists and voter registration lists, the Council hoped to account for virtually all Native Americans living within San Juan County. Although the Agreement specified a target percentage of Native Americans only with respect to the questionnaire lists, the Council took the position that the only legitimate method of meeting this goal was to ensure accurate representation of Native Americans on the master list. The Council reasoned that accurate representation on the master list should produce questionnaire lists that complied with the Agreement's requirements without necessitating any special supplemental measures, such as drawing additional Native American names after a random draw had failed to produce a questionnaire list within the Agreement's designated percentage range. Moreover, such a policy would ensure more complete representation on the master list, and any given Native American on that list would have essentially the same likelihood of appearing on the questionnaire list as any other listed person.[6]

¶ 12 However, the Council soon encountered difficulties identifying where tribal members living near state boundaries actually resided. An individual was eventually retained to survey residents along the Utah Arizona border, but he did not provide information in the form it was requested. Nonetheless, the Council was ultimately able to build a list of names from which it derived a questionnaire list ostensibly complying with

4. In this regard, Brent Johnson, General Counsel for the Administrative Office of the Court and the Council, testified that the Council anticipated the protocol would include the following procedures:

> The questionnaires for ... Native Americans on the reservation will be sent out in the name of the Tribal Court. Those questionnaires will be returned to the Tribal Court.... There will then be a cooperative effort to come up with a qualified list based on the questionnaires the Tribal Court will review.... From that point, jury summons [sic] will be sent out. Again ... Native Americans on the reservation will receive a summons in the name of the Tribal Court.... If anyone does not show up at that point, the Navajo Court will have responsibility for sending out an order to show cause or a warrant or whatever they cho[o]se to bring that person into the Court to answer as to why they did not attend the District Court proceedings.

Johnson testified that these procedures were necessary because the Council was conducting "a cooperative agreement between a State system and a Sovereign Tribal Court System."

5. Johnson testified as follows in summarizing these difficulties:

> [The representatives of the Navajo Nation] are going through a different process than originally anticipated. Originally it was anticipated that Jim Zion [Solicitor General of the Navajo Nation] and Chief Justice Yazzie [Chief Justice of the Tribal Court] could act on behalf of the Judicial Branch of the Navajo Nation and the protocol could be signed. Because of other involvement, it has been determined that the protocol must now go within other procedures with the Nation to receive final approval. Where once we had a fairly simple procedure for judicial cooperation, we now have a more political process in which it must receive the input of many other people.

6. It should be noted that this likelihood is nonetheless subject to certain limitations. Prior to trial, a question was raised with respect to the problem of name duplication on the master list. Apparently, the computer program employed to merge names from different source lists often did not identify instances where the same individual was listed with slightly different name spellings. The problem was inherent in the computer merging process and resulted in a fair amount of name duplication. Although it was evident that Native Americans were under-represented vis-a-vis the rest of the population on driver's license and voter registration lists, it was not clear whether Native Americans were more or less likely to be duplicated after the addition of a new source list containing only Native American names. The district court specifically found that "[t]he issue of duplicate names is not relevant to and is beyond the scope of the matters tried and is beyond the scope of the Agreement."

the Native American percentage mandated by the Agreement.[7]

¶ 13 A further dispute arose regarding the Agreement's requirements for the target percentage. The Council took the position that the 1990 census figures provided the target percentage for Native Americans to be included on the master jury lists it prepared for use in the Seventh Judicial District, whereas Crank asserted that the percentage should be estimated on an annual basis according to additional available data. Census data indicated that Native Americans constituted 51.68 percent of San Juan County's adult population in 1990. Crank contended that the proportion of Native Americans had actually increased to approximately 60 percent of the population and that the percentage would likely continue to increase. Regardless of this dispute, the Council concededly failed to meet even its own minimum target percentage of 46.68 percent by the stated deadline of January 31, 1997.

¶ 14 In September of 1997, Crank filed a "Verified Motion for Appointment of a Receiver to Enforce Consent Decree and for Order to Show Cause." This motion and its accompanying memorandum described a host of alleged violations of the Agreement by both the Council and Judge Lyle R. Anderson. Crank alleged Judge Anderson had violated the Agreement by continuing to hold jury trials wherein juries were drawn from questionnaire lists that did not comply with the Agreement's mandate. Crank did not take any steps to formally add Judge Anderson as a party to the case; nor did Crank submit an affidavit purporting to meet the conditions prescribed by Section 78–32–3 of the Utah Code, which dictates the procedures for initiating contempt proceedings for conduct committed outside the court's pres-

ence. Instead, Crank simply mailed a copy of the motion to Judge Anderson. In subsequent documents, including various discovery requests, Crank added Judge Anderson to the caption and denoted him as a "contemnor." At one point, Crank did request that the district court sign the order to show cause. This request did not specifically refer to Judge Anderson and the court never signed any order requiring him to appear.

¶ 15 Judge Anderson nonetheless appeared specially and filed a motion to strike the allegations against him. He argued that because he was not a party to the Agreement he had no duty to implement its requirements. The district court agreed and held as follows:

> There is no affirmative duty in [the] Agreement on the judges to construct an appropriate master list. Rule 4–404 of the Utah Code of Judicial Administration clearly gives the Council ... the responsibility and the power to create a master list of jurors. And the judges are bound to use that list.... I find that Judge Anderson has no affirmative duty that arises out of this Agreement. I also find that he could only be in contempt of this court under the Agreement if he did something to frustrate the Council's efforts to comply with the Agreement. I find no evidence of that.

Based on these findings, the court granted Judge Anderson's motion to strike the allegations against him.

¶ 16 Prior to trial, Crank and the Council stipulated that the Council had failed to meet the Native American percentage requirements with respect to its questionnaire lists, and had failed to file a plan or any reports. Despite these admitted defaults, the Council maintained that it had pursued its obligations

7. As is noted in the subsequent discussion, the actual target percentage remained a disputed issue between the parties. The Council took the position that it was required to meet a minimum percentage of 46.68 percent of Native Americans on its jury questionnaire lists (i.e., 51.68 percent minus the five percent variation allowed by the Agreement). The supplemented questionnaire list did not become available until the latter half of 1998. That list contained 500 names, 51.1 percent of which were identified as being Native American. Prior questionnaire lists failed to meet the Council's minimum target percentage, and the list provided for the first half of 1998 contained only 39.98 percent Native Americans. According to the Agreement, the two lists in a given year were to be averaged to determine compliance. Thus, notwithstanding the attainment of the target percentage for the second half of 1998, the two 1998 lists in combination did not satisfy the Agreement's requirement for that year. It is also undisputed that the Council failed to reach the target percentage for any portion of 1997.

under the Agreement diligently and was committed to maintaining accurate proportional representation of Native Americans on the Seventh District master jury list and jury questionnaire lists. It likewise asserted its continuing commitment to finalizing and filing its plan, to be followed by the required annual reports.

¶ 17 The district court made findings respecting the Council's stipulations. Specifically, the court found that "[the Council] encountered numerous difficulties in obtaining useable lists from the Navajo Nation, including some understandable resistance from the Navajo Nation. These difficulties caused delay in acquiring the lists." The court noted that the Council had finally acquired a list in October of 1997, merged that list with the existing source lists of registered voters and driver's license holders, and had begun using the new master list since the second half of 1998.

¶ 18 Although the district court commended the Council on its efforts to obtain a supplemental list of eligible jurors from the Navajo Nation and acknowledged the difficulties the Council had encountered, it also held that those difficulties did not excuse the Council's failure to comply with the monitoring requirements of the Agreement. In this regard, the court stated that "[the Council] believed its communications with [Crank's counsel] while negotiating with the Navajo Nation excused its ... breaches. The court, however, has an independent interest in seeing that the Agreement is performed." The court also noted that if the Council had requested an extension to meet the various deadlines imposed by the Agreement, "the court would likely have granted it."

¶ 19 Despite the stipulations, the parties could not resolve their disagreement concerning the Agreement's requirements for determining the "estimated percentage of adult Native Americans in San Juan County in any given year." As noted above, the Council contended that the appropriate figures could be drawn from the decennial federal census data, whereas Crank asserted

that an independent annual estimate was required. Because the parties could not come to any new agreement on this issue, it was tried in the district court.

¶ 20 At the conclusion of trial, the district court held that the 1990 census data provided the baseline estimate required by the Agreement until the 2000 census was published. In its conclusions of law, the court ruled that "[i]f after the two questionnaire lists for a given year are averaged and that average does not reach at least 46.68%, then defendant should, in order to comply with the Agreement, take appropriate action to bring the average of the two lists to at least 46.68%." The court also ordered the Council to file its juror plan and first report "forthwith." [8]

¶ 21 Both Judge Anderson and Crank moved for awards of attorney fees. Judge Anderson argued that he was entitled to receive attorney fees from Crank's counsel pursuant to Utah Rule of Civil Procedure 11, which provides that the court "may ... impose an appropriate sanction" upon an attorney who has brought a frivolous claim or presented a pleading for an improper purpose. Crank argued that he was entitled to receive attorney fees from the Council pursuant to 42 U.S.C. § 1988, which grants trial courts discretion to award attorney fees to prevailing parties "[i]n any action or proceeding to enforce a provision of section ... 1983 ... of this title." *Id.*

¶ 22 The district court declined both requests to award attorney fees. The court denied Judge Anderson's requests for attorney fees "because although the court's decision on the [m]otion to [s]trike was not a close call, the court finds that plaintiff acted in good faith, although misguided, in attempting to have Judge Anderson found in contempt of court for failure to comply with the Agreement." With respect to Crank's request, the district court found "that plaintiff [Crank] was not the prevailing party on the substantive issues tried. The [c]ourt finds that defendant [Council] prevailed on the primary issue: whether the Agreement

---

8. The Council admitted that it had not finalized the protocol with the Navajo Nation. Evidently, the court's order simply required the Council to file a copy of its proposal as it existed at that time.

required a yearly estimate of the adult Native American population in San Juan County."

## ANALYSIS

¶ 23 The parties raise the following issues on appeal: (1) Crank contests the district court's order striking the allegations against Judge Anderson; (2) Judge Anderson contests the court's denial of his motion for attorney fees under rule 11 of the Utah Rules of Civil Procedure; and (3) Crank contests the court's denial of his own motion for attorney fees under 42 U.S.C §§ 1983 & 1988.[9] We address these issues in order.

### I. THE CONTEMPT ALLEGATIONS AGAINST JUDGE ANDERSON

¶ 24 Crank alleges Judge Anderson was in contempt of the district court's consent decree. Judge Anderson was not a party to the case at the time Crank filed his verified motion in September of 1997, and Crank never took any steps to have Judge Anderson reinstated as a party. Nor did Crank obtain any order directing Judge Anderson to appear and defend the new allegations according to the dictates of Section 78-32-3. Instead, Crank simply mailed papers to Judge Anderson denoting him as a contemnor.

¶ 25 Clearly, a trial court has the power to hold non-parties in contempt if those parties conspire to frustrate a lawful order of the court. *See id.* Specifically, a person may be held in contempt for "[d]isobedience of any lawful judgment, order or process of the court," *id.* § 78-32-1(5), or "[a]ny other unlawful interference with the process or proceedings of a court," *id.* § 78-32-1(9). However, a court's power to hold any person in contempt, whether a party to a case before that court or a non-party, is

subject to constitutional and statutory restraints regarding the process due to any person so accused. *See Von Hake v. Thomas,* 759 P.2d 1162, 1169–70 (Utah 1988).

¶ 26 The basic constitutional requirement for due process is that "the person charged be advised of the nature of the action against him [or her], have assistance of counsel, if requested, have the right to confront witnesses, and have the right to offer testimony on his [or her] behalf." *Burgers v. Maiben,* 652 P.2d 1320, 1322 (Utah 1982). The Utah Code seeks to implement this mandate by "set[ting] out two distinct procedures to be followed in contempt adjudications, one when the contempt is direct, i.e., committed in the presence of the judge, and the other when the contempt is indirect, i.e., committed outside the presence of the judge." *Thomas,* 759 P.2d at 1169.

¶ 27 In cases of direct contempt, the court may summarily punish the contemnor. *See id.* at 1169–70; Utah Code Ann. § 78-32-3. "Indirect contempt, in contrast to direct contempt, can properly be adjudged only in a proceeding more tightly hedged about with procedural protections." *Thomas,* 759 P.2d at 1170. In such cases, the Utah Code amplifies upon the basic due process requirements of notice and opportunity to defend. *See id.* Section 78-32-3, in pertinent part, provides as follows:

> When the contempt is not committed in the immediate view and presence of the court or judge at chambers, an affidavit shall be presented to the court or judge of the facts constituting the contempt, or a statement of the facts by the referees or arbitrators or other judicial officers.[10]

¶ 28 Thus, in Utah, the statutory requirement of an affidavit is a procedural prerequisite to the imposition of any sanc-

---

9. Crank did not appeal the court's ruling that the 1990 census provides the target percentage for Native Americans to be included on the jury questionnaire lists. Both Crank and Anderson request attorney fees on appeal.

10. The subsequent section further details the procedures applicable to contempt proceedings:

> When the contempt is not committed in the immediate view and presence of the court or

judge a warrant of attachment may be issued to bring the person charged to answer, or, without a previous arrest, a warrant of commitment may, upon notice, or upon an order to show cause, be granted; and no warrant of commitment can be issued without such previous attachment to answer, or such notice or order to show cause.

Utah Code Ann. § 78-32-4.

tions for indirect contempt. *See Thomas*, 759 P.2d at 1171; *see also Khan v. Khan*, 921 P.2d 466, 468 (Utah Ct.App.1996); *Boggs v. Boggs*, 824 P.2d 478, 481–82 (Utah Ct.App. 1991). Crank never submitted an affidavit, nor have the parties specifically addressed the issue of whether Crank's verified motion—which did include specific allegations against Judge Anderson—could be treated as an affidavit for purposes of Section 78–32–3.[11]

■ ¶ 29 Even assuming arguendo that Crank's motion did constitute an affidavit meeting the statutory requirement, the court did not abuse its discretion in striking the allegations. Those allegations were insufficient to warrant initiation of contempt proceedings because they did not provide any sworn facts that indicated a violation of the Agreement or an attempt to interfere with its implementation. Crank asserted that Judge Anderson had the affirmative duty to unilaterally remedy the Council's failure to meet the Agreement's deadline for compliance with the required percentage of Native Americans on the jury questionnaire lists. Even a cursory reading of the Agreement refutes this assertion. Judge Anderson was not a party to the Agreement and it imposed no affirmative duties upon the judges of the Seventh District.

¶ 30 Moreover, despite Crank's conclusory contentions that Judge Anderson conspired with the Council, there are no concrete factual allegations indicating that Judge Anderson undertook any actions that could be remotely construed as hampering the Council's efforts. Nor has Judge Anderson contributed to any of the Council's conceded failures to comply with the Agreement's terms. Therefore, the district court had no basis for taking further action on the contempt allegations against Judge Anderson. We affirm the court's refusal to entertain Crank's insufficient allegations of contempt.

## II. JUDGE ANDERSON'S MOTION FOR ATTORNEY FEES.

■ ¶ 31 Judge Anderson moved for attorney fees pursuant to rule 11 of the Utah Rules of Civil Procedure. In denying Judge Anderson's motion, the court stated that "sanctions should be denied because although the court's decision on the Motion to Strike was not a close call, the court finds that Plaintiff acted in good faith, although misguided, in attempting to have Judge Anderson found in contempt of the court for failure to comply with the Agreement."

Rule 11(b) provides as follows:[12]

*Representations to court.* By presenting a pleading, written motion, or other paper to the court (whether by signing, filing, submitting, or later advocating), an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifical-

---

**11.** In another context, we have held that "[a] verified pleading, made under oath and meeting the requirements for affidavits established in Rule 56(e) of the Utah Rules of Civil Procedure, can be the equivalent of an affidavit for purposes of a motion for summary judgment." *See Pentecost v. Harward*, 699 P.2d 696, 698 (Utah 1985). We have not had occasion to address the question of whether the somewhat specialized due process requirement of an affidavit dictated by Section 78–32–3 likewise may be satisfied by a verified pleading. Nor do we purport to do so in this case.

**12.** Subpart (4) of rule 11(b) pertains to denials of factual contentions. Because no such denials are at issue in this case, we do not address this subpart in our discussion.

ly so identified, are reasonably based on a lack of information or belief.

Rule 11(c) provides as follows:

> *Sanctions.* If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may ... impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

Rule 11(c) by its express terms vests discretion in the district court. A violation of rule 11(b) does not mandate the sanction of attorney fees.

¶ 32 Judge Anderson argues that the district court erroneously interpreted the legal requirements of rule 11(b). We review the court's interpretation of those legal requirements for correctness. *See Morse v. Packer*, 1999 UT 5, ¶ 10, 973 P.2d 422. Judge Anderson first contends that the court's finding that "plaintiff acted in good faith" indicates that the court misunderstood the requirements of rule 11. Specifically, Judge Anderson asserts that a party could present pleadings, motions, or other papers for an "improper purpose," without necessarily acting in bad faith. However, Judge Anderson fails to articulate any basis for drawing that distinction in the context of the facts of this case. Judge Anderson asserts that Crank's counsel brought allegations of contempt for the purpose of "harassing and embarrassing Judge Anderson." Such a purpose could not be pursued in good faith. If Judge Anderson's characterization of Crank's counsel's motive is true, then the allegations of contempt were brought in bad faith. Thus, the trial court did not ignore any purported distinction between bad faith and improper purpose, but rather simply disagreed with Judge Anderson's characterization of Crank's counsel's motive when it found that Crank's allegations were not brought in bad faith. We decline to set aside the court's finding with respect to rule 11(b)'s improper purpose prong.

¶ 33 Second, Judge Anderson maintains that the district court erred by impliedly reading all of rule 11(b)'s subparts as requiring a finding of bad faith. In other words, the court assumed that because Crank's counsel satisfied the good faith requirement of subpart (1), it was unnecessary to consider whether he had satisfied the requirements of subparts (2) and (3). Judge Anderson contends that each subpart furnishes a distinct basis for a finding of a violation of the rule. We agree. By its express terms, rule 11(b) provides that an attorney certifies that the requirements of each subpart are independently met. Subparts (2) and (3) of Rule 11(b) pertain to pleadings, motions, or other papers that are frivolous in terms of their lack of evidentiary support or legal basis for their maintenance. While bad faith may often be associated with violation of subparts (2) or (3), such is not a necessary element. *See Pennington v. Allstate Ins. Co.*, 973 P.2d 932, 939 n. 3 (Utah 1998) (citing *Taylor v. Estate of Taylor*, 770 P.2d 163, 171 n. 13 (Utah Ct.App.1989)). A lawyer may bring frivolous or inadequately supported claims merely by failing to exercise the minimal required level of professional care and judgment. The court's ruling fails to address the question of whether Crank's allegations separately violated the requirements of subparts (2) and (3).

¶ 34 Although it remains within the court's discretion to apply sanctions under rule 11(c) even if it finds a violation of rule 11(b), we do not have a record indicating that the court even exercised its discretion with respect to subparts (2) and (3). We therefore remand for proper consideration of Judge Anderson's arguments with respect to those subparts.[13]

### III. CRANK'S MOTION FOR ATTORNEY FEES

¶ 35 Crank asserts that he is entitled to attorney fees under 42 U.S.C. § 1988(b),

---

13. We further note that Judge Anderson points out a potential ambiguity in the court's holding with respect to sanctions. In denying sanctions, the court refers to the "Plaintiff," which could conceivably be interpreted as referring only to Crank himself, and excluding any separate consideration of the conduct of his attorney. For rule 11 purposes, the distinction between client and attorney is important because sanctions can be imposed against either. Given the posture of this case, it seems unlikely that the district court ignored Judge Anderson's allegations against Crank's attorney and limited its ruling to Crank himself. Nonetheless, we note the ambiguity for the court's benefit, so that it will have an opportunity to rectify any confusion on remand.

which provides, in pertinent part, that "[i]n any action or proceeding to enforce a provision of section[ ] ... 1983 ... of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." Crank argues the district court erred in holding he was not a prevailing party under this standard and in refusing to award him attorney fees. In response, the Council asserts that Crank's September 1997 motion was not a civil rights action subject to attorney fees under section 1988, but was instead merely an action to enforce a contract. The Council also defends the court's finding that Crank was not a prevailing party.

■ ¶ 36 The Council's attempt to characterize Crank's motion as a common law contract action is misplaced. Crank initially brought his suit as an action under 42 U.S.C. § 1983. Section 1988 of the same title provides that a prevailing party may receive attorney fees as an award of costs. Crank's initial action was settled pursuant to the Agreement, which was formulated as a consent decree. Notably, the district court retained jurisdiction. Crank's present motion was an action to enforce the decree according to the court's continuing jurisdiction and not a new action based upon some other ground.

¶ 37 The Council relies primarily on *Arvinger v. Mayor and City Council of Baltimore*, 31 F.3d 196, 200–02 (4th Cir.1994). We first note that we are not bound by the holding in that case. Moreover, *Arvinger* does not support the Council's argument on this issue. Although *Arvinger* dealt with a somewhat similar scenario—where the plaintiff asserted the defendant had failed to abide by the terms of a settlement agreement—it also specifically acknowledged that "when plaintiffs are forced to litigate to preserve the relief originally obtained," and where the

issues pertaining to both actions are "inextricably intermingled," the plaintiff may be treated as a prevailing party. *Id.* at 202. Crank's motion facially meets this test. He alleges he has been compelled to litigate due to the Council's failure to abide by its obligations under the settlement agreement and the issues upon which he predicates his claim for attorney fees are the same issues that were litigated and settled in the original action. We thus reject the Council's claim that Crank's motion is not actually predicated upon section 1983.

■ ¶ 38 Whether the motion to enforce the Agreement qualifies Crank for prevailing party status under section 1988 presents a separate question, however, to which we now turn. In *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the United States Supreme Court addressed the question of the standards applicable to an award of attorney fees under section 1988. The *Farrar* Court prescribed as follows the standard for determining prevailing party status:

> To qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought ... or comparable relief through a consent decree or settlement.... Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement.... In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar*, 506 U.S. at 111–12, 113 S.Ct. 566 (citation omitted).[14]

---

14. In one sense, litigation often alters or affects the behavior of the litigants merely by its institution or renewal. The abandonment of informal methods of dispute resolution in favor of a formal, adversarial appeal to authority usually chills the relationship between the parties, and results in a significantly diminished degree of trust. The formalization of such relationships then manifests itself in an increased attention to the strict legal requirements of the relationship. That sort

of alteration, by itself, cannot be the type of behavioral modification of which *Farrar* speaks. *Farrar* instead refers to *legally-mandated* modifications of behavior brought about as a direct result of the suit. In this case, it seems likely that Crank's second suit has instilled a certain heightened degree of circumspectness in the Council's adherence to the procedural details of the Agreement. However, that alteration alone does not confer prevailing party status on Crank.

¶ 39 In this case, it is not clear whether the district court considered this standard. In rendering its finding that Crank "was not the prevailing party on the substantive issues tried," the court ruled that the Council "prevailed on the primary issue: whether the Agreement required a yearly estimate of the adult Native American population in San Juan County." The governing standard, however, does not premise its determination of prevailing party status upon "primary" issues. Instead, it simply requires "some relief on the merits" of the party's claim that "materially alters the legal relationship between the parties." *Id.* at 110–11, 113 S.Ct. 566. The United States Supreme Court held that the plaintiff in *Farrar* was a prevailing party even though that plaintiff received only nominal damages of one dollar on his seventeen million dollar claim. *Id.* at 113, 113 S.Ct. 566.

 ¶ 40 In this case, Crank asserts that the district court's order and the stipulations he obtained from the Council were sufficient to confer prevailing party status. With respect to the stipulations, we disagree. Even assuming the stipulations were analogous to a settlement or can otherwise be considered as "comparable relief" according to the *Farrar* standard, those stipulations do not provide a basis for a finding that Crank was a prevailing party. The Council admitted that it had failed in its obligations to the court by neglecting to obtain extensions of time with respect to explicit deadlines within the Agreement. However, it did not admit to any failures in its obligations toward Crank nor to any alteration in its commitment to finalize the protocol with the Navajo Nation and file a plan in conformity with the Agreement. Because the stipulations did not create any legally-enforceable alteration in the Council's behavior toward Crank, the court could not employ them as a predicate for a finding that Crank was a prevailing party.

¶ 41 However, the court's rulings and judgment rendered at the conclusion of trial ar-guably provided a potential basis under *Farrar* for a finding that Crank was a prevailing party. Notably, the court directed the Council to implement special measures in the event its practice of employing a random draw from the master jury list did not produce the required minimum percentage of Native Americans on the questionnaire lists. The court also ordered the Council to file its plan forthwith, whether finalized or not, as well as its first report.[15] At present, it is unclear whether these orders created a legally-enforceable modification of the Council's behavior, or whether any direct benefit inured to Crank as a result.

¶ 42 Apparently, the Council was relying upon the establishment of an accurate master list to ensure questionnaire lists that complied with the Agreement's mandates. The court made no findings regarding the Council's pre-litigation intent, willingness, or obligation to implement special measures beyond its traditional practice of randomly drawing names from the master list if that procedure failed to produce questionnaire lists complying with the Agreement. Nor did the court's order specify what special measures should be taken. The court simply held that the Council should "take appropriate action," and "undertake reasonable efforts" in the event a random draw failed to produce the minimum required percentage.[16]

 ¶ 43 Because we are unable to discern the actual impact of these holdings on the Council's behavior or the precise nature of the benefit Crank may have received as the result of his motion, we remand this issue to the district court for adequate findings and rulings according to the governing federal law. In so doing, we note that prevailing party status under section 1988 does not automatically require an award of fees. "Once civil rights litigation materially alters the legal relationship between the parties, 'the degree of the plaintiff's overall success goes to the reasonableness' of a fee award. . . ." *Farrar*, 506 U.S. at 114, 113

---

15. The court also held that the 1990 census and the 2000 census would provide the reference percentage for determining compliance with the Agreement's requirements. Because these holdings validated the Council's position at trial, there is no basis for designating Crank a prevailing party with respect to them.

16. These directives were further subject to the caveat that "[i]n the event [the Council] is unable to continue to reach the target range as contained in this Judgment . . . then [the Council] may request from the Court modification of the Agreement."

S.Ct. 566 (quoting *Texas State Teachers Assoc. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)); *see also Hensley v. Eckerhart*, 461 U.S. 424, 430, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The trial court is charged with determining the reasonableness of fees according to the particular circumstances of the case, *see Hensley*, 461 U.S. at 430–33, 103 S.Ct. 1933, and the court retains a certain measure of discretion to "lawfully award low fees or no fees" at all. *Farrar*, 506 U.S. at 114–15, 113 S.Ct. 566.[17]

¶ 44 To summarize, we affirm the court's ruling wherein it refused to hold Judge Anderson in contempt. We remand the issue of Judge Anderson's claim for attorney fees under subparts (2) and (3) of Utah R. Civ. P. 11(b) and the issue of Crank's claim for attorney fees under 42 U.S.C. § 1988 for the district court's determination consistent with the directives in this opinion.[18]

¶ 45 Justice DURHAM, Judge JACKSON, Judge BILLINGS and Judge HENRIOD concur in Justice DURRANT'S opinion.

¶ 46 Having disqualified himself, Chief Justice HOWE does not participate herein. Court of Appeals Judge NORMAN H. JACKSON sat.

¶ 47 Having disqualified himself, Associate Chief Justice RUSSON does not participate herein. Court of Appeals Judge JUDITH M. BILLINGS sat.

¶ 48 Having disqualified himself, Justice WILKINS does not participate herein. District Court Judge STEPHEN L. HENRIOD sat.

---

17. On appeal, Crank also argues that this court may award fees under the private attorney general doctrine. We do not consider this argument because Crank did not adequately brief it in his motion for fees before the trial court. He merely mentioned the doctrine in a footnote and requested the opportunity to brief the issue "should the court find this principle to be applicable to this case." Such a contingent offer of argument does not suffice to preserve an issue for appeal.

18. We find no basis for awarding any attorney fees on appeal at this time. Judge Anderson and Crank base their claims for such fees upon the principle that a party who is entitled to attorney fees at the trial court level is likewise entitled to an award of fees on appeal. *See Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998). The question of entitlement to fees at the trial court level has not yet been determined. Thus, any appropriate award of attorney fees on appeal is dependent upon that determination and should be assessed by the district court on remand.