### CLAIR W. AND GLADYS JUDD FAMILY LIMITED PARTNERSHIP, Plaintiff and Appellant,

v.

### Bernell L. HUTCHINGS, Mrs. Bernell Hutchings, Ronald J. Sherman, and Mrs. Ronald J. Sherman, Defendants and Appellees.

#### No. 860100.

Supreme Court of Utah.

Aug. 20, 1990.

Don R. Petersen, Danielle Eyer Davis, Provo, for plaintiff and appellant.

Michael J. Petro, Provo, for defendants and appellees.

HOWE, Associate Chief Justice:

Plaintiff appeals from a judgment determining the boundary between its property and defendants' property to be a long-standing fence line, based on the rule of boundary by acquiescence.

Plaintiff and defendants own adjoining tracts of land in Utah County, with plaintiff's tract lying immediately south of defendants' tract. The parties have stipulated that the legal descriptions of the two tracts overlap, as much as twenty-one feet at one point. Lying south of both deed lines is a fence line which the trial court found that the parties and their predecessors had acquiesced in for a long period of time as the boundary. Plaintiff commenced this action to quiet title to its tract as described by the legal description in its deed, to relocate the fence line, and to obtain damages. Defendants counterclaimed, seeking to quiet title on the existing fence line. The trial court found that the parties and their predecessors in interest had occupied their respective tracts of land up to the fence for at least twenty years and "very likely" for over forty years; that during that time they had acquiesced in and recognized the fence line as the boundary between them; and that neither party had ever attempted to occupy any land on the opposite side of the fence line.

■ Plaintiff contends that the evidence does not establish the necessary elements of boundary by acquiescence. Those elements have been enumerated in many prior decisions of this court. They are:

1. Occupation up to a visible line marked by monuments, fences, or buildings;
2. Mutual acquiescence in the line as a boundary;
3. For a long period of time;
4. By adjoining landowners.

See *Brown v. Milliner*, 120 Utah 16, 232 P.2d 202 (1951). In *Halladay v. Cluff*, 685 P.2d 500 (Utah 1984), this court added a fifth element, namely, evidence of dispute or uncertainty as to the true boundary line measured against an objective test. However, in the recent case of *Staker v. Ainsworth*, 785 P.2d 417, 424 (Utah 1990), *Halladay v. Cluff* was overruled insofar as it imposed that additional element. Inasmuch as the instant case was tried and this appeal filed prior to our decision in *Staker v. Ainsworth*, we consider the fifth element a requirement here.

■ The evidence supporting the trial court's determination that the adjoining owners had acquiesced in the fence line as the boundary may be briefly summarized as follows: Richard York testified that he purchased the property in about 1942, that the property was surveyed and a fence was erected on the survey line, and that the fence that was there at the time of trial (1985) was in the same place as the fence he had erected. He stated that he recognized his workmanship in the southeast corner post, the wire wrapped around it, and the braces supporting it. York sold the property in 1946 to Frank Rigtrup, who testified that the fence that was there at the time of trial was in the same place as it was when he purchased the property and when he sold it six years later, although the wire and some of the posts had been replaced.

The property was acquired in 1952 by Brigham Liechty. His son Victor J. Liechty testified that he was nineteen years old in 1952 and that the fence that was there at the time of trial was in the same place as it was in 1952. He further testified that some of the posts and wire had been replaced through the years but the location had remained the same. He saw the property on a regular basis until 1961 and, after that, visited it at least yearly until it was sold to defendant Hutchings in 1981. He stated that he had been on the property probably several hundred times between 1952 and 1981 and was certain that the fence had not been moved. During that time, he had never heard any talk or suggestion that the fence was not on the deed line.

Two men who worked on the property during the twenty-nine years that it was owned by Liechty also testified that the fence there at the time of trial was in the same place as the fence which had been there when they worked there. Raphel C. Palfreyman testified that in 1961, he began working for Brigham Liechty on the property, and four years later, commencing in 1965, he leased the property and farmed it himself. During that time, the fence was repaired and posts replaced, except for the two corner posts, which remained undisturbed up to the time of trial. He further stated that sometimes Dr. Clair Judd, a member of plaintiff partnership, assisted in the repairs, but not once did Judd then suggest or imply that the fence was not in the proper location. Palfreyman acknowledged that Dr. Judd had cemented an irrigation ditch which ran along the fence line, at which time the fence was removed to accommodate the construction, and the new fence which was erected ran between the two old corner posts, which were not disturbed.

The other witness who had worked on the property during Liechty's term of ownership was defendant Burnell L. Hutchings. He testified that he worked for Liechty in 1956, when Hutchings was eighteen years old, that the fence that was there at the time of trial was in the same place as it was in 1956, that the post at the southeast corner of the Hutchings' property at the time of trial was there in 1956, and that the fence ran west from that post the same as it did in 1956. He further testified that in 1984, plaintiff erected a new fence with pipe posts, but those posts were tied to the old cedar posts which had been there for years previously.

In summary, there was an abundance of testimony adduced from five different witnesses that the fence that was there when the dispute arose was in the same place as it had been since about 1942—a span of some forty years. These same witnesses testified that the respective owners of the adjoining tracts had acquiesced in the fence line as the boundary between their properties. While it is true that plaintiff produced evidence that there had not always been acquiescence in the fence line as the boundary and that the fence line was moved several feet on one or more occasions, the trial court was not required to believe and accept this evidence as against the evidence adduced by defendants. Rule 52(a), Utah Rules of Civil Procedure, forbids us from setting aside factual findings unless clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. We find nothing in the trial court's findings of fact which would suggest that they are erroneous, let alone "clearly erroneous." In *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985), we stated that we would not overturn a finding of fact without first marshaling all the evidence supporting the finding and then demonstrating that when viewed in the light most favorable to the trial court, the evidence is clearly insufficient to support that finding.

■ Plaintiff next contends that even though there may have been acquiescence in the fence line as a boundary, there was no objective uncertainty so as to satisfy that requirement as enunciated in *Halladay v. Cluff*. It argues that although the legal descriptions as contained in the deeds of the parties overlap, it is a question of law as to which deed has priority over the other. We reject this argument. In *Halladay v. Cluff*, 685 P.2d at 506, "conflicting terms in deeds, such as overlapping descriptions, *Motzkus v. Carroll*, 7 Utah 2d 237, 239, 322 P.2d 391, 393 (1958)," was given as an example of objectively measurable uncertainty. The trial court found objective uncertainty because of the overlap. This was not error.

■ Finally, plaintiff assails the trial court's refusal to admit into evidence statements allegedly made by Brigham Liechty during the time he was the owner of defendants' property to the effect that he did not think that the fence line was on the true boundary between the two properties. The trial court ruled that any such statements would be hearsay and not admissible unless plaintiff's counsel could cite to him a rule in the Utah Rules of Evidence which would

allow admission of such statements. Counsel was unable to do so. Again, in this court, plaintiff urges admission of the statements but fails to cite any rule of evidence in support. Instead, plaintiff relies on *Roach v. Dahl*, 84 Utah 377, 385, 35 P.2d 993, 996 (1934), where this court made brief reference to an exception to the hearsay rule which would allow admission of hearsay evidence to prove the location of an ancient corner or boundary line. That principle appears to have been incorporated into our present Utah Rule of Evidence 803(20), which states that the following is not excluded by the hearsay rule:

(20) Reputation concerning boundaries or general history. Reputation in a community arising before the controversy, as to boundaries of or customs affecting lands in the community and reputation as to events of general history important to the community or State or nation in which located.

It is apparent that plaintiff's proffered testimony did not consist of reputation in the community as to a boundary. The statements were simply the subjective opinion of a former owner. Clearly, they did not qualify for admission, and the trial court did not err in its ruling. Rule 803(20) appears to be based on a principle recognized in *Boardman v. Lessees of Reed & Ford*, 31 U.S. (6 Pet.) 328, 341, 8 L.Ed. 415, 420–21 (1832), where Justice McLean, speaking for the Supreme Court of the United States, said: "Landmarks are frequently formed of perishable materials, which pass away with the generation in which they are made. By the improvement of the country, and from other causes, they are often destroyed. It is therefore important, in many cases, that hearsay or reputation should be received to establish ancient boundaries...." It is readily apparent that plaintiff was not attempting to prove

the location of an ancient boundary by the alleged statements of Liechty.

Judgment affirmed.

DURHAM and ZIMMERMAN, JJ., concur.

HALL, Chief Justice (dissenting).

I do not join the opinion of the court for the reason that I am not persuaded as to the sufficiency of the evidence to support the judgment of the trial court.

In *Parsons v. Anderson*,[1] we again reviewed the boundary by acquiescence doctrine and noted that to create such a boundary, the following evidence must be shown:

(1) Occupation up to a visible line marked by monuments, fences or buildings, (2) mutual acquiescence in the line as a boundary, (3) for a long period of time, (4) by adjoining landowners. In addition, there must be (5) evidence of dispute or uncertainty as to the true boundary line measured against an objective test.[2]

The evidence in this case fails to satisfy the second and third prongs of this test.

The standard of review applicable to this case is governed by rule 52(a) of the Utah Rules of Civil Procedure, which states in part, "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." As the court has previously noted, this rule gives deference to decisions of the trier of fact, "'who is usually in a superior position to appraise and weigh the evidence.'"[3] The question for the appellate court, then, is whether the "the findings are against the clear weight of the evidence"[4] or whether "'on the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed.'"[5] In applying this test to the

1. 690 P.2d 535 (Utah 1984).

2. *Id.* at 538–39 (footnotes omitted).

3. *State v. Ashe*, 745 P.2d 1255, 1258 n. 5 (Utah 1987) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969)).

4. *State v. Featherson*, 781 P.2d 424, 431–32 (Utah 1989).

5. *Ashe*, 745 P.2d at 1258 n. 5 (quoted source & citation omitted); *accord State v. Walker*, 743 P.2d 191, 193 (Utah 1987); *Featherson*, 781 P.2d at 432; *Western Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376, 1377

case before us, the court's findings regarding the fence line as the boundary are not supported by substantial credible evidence.[6] Instead, they are against the clear weight of the evidence, thus creating a "definite and firm conviction that a mistake has been committed."[7]

The trial court stated its findings as follows:

> 1. The Court finds that the evidence is undisputed, that the parties occupied their respective parcels of land up to a visible line marked by the fence.

> 2. The court finds that evidence established the parties' acquiescence in recognizing the fenceline as a boundary. At the very least this is established by fact [sic] that neither party attempted to occupy the property opposite the fenceline from their own parcel of land.

> 3. The Court finds that the fence has been in its present position, with only minor alterations for reasons immaterial to this decision, for a sufficient period of time. The evidence is clear that the fence has existed in substantially the position indicated by the survey, exhibit # 4, for at least twenty years as required by *Hobson v. Panguitch Lake Corp.*, 530 P.2d 792, 795 (Utah 1975), and that it very likely has existed in its current position for over forty years.

> 4. The court finds that there is no dispute that the parties are adjoining land owners, or that there [sic] predecessors have occupied the parcels of land up to the fence line for over forty years.

> 5. The court finds that there is an objectively measurable uncertainty regarding the boundary. The evidence clearly showed that the boundaries of the parcels overlap by as much as 21.8 feet according to the leal [sic] descriptions of record for each parcel. This fact is confirmed by the survey performed by Donald C. Cole and admitted into evidence as exhibits # 4 and # 5. *Halladay* lists as

an example of objectively measurable uncertainty "conflicting terms in deeds, such as overlapping descriptions, *Motzkus v. Carrollng*, [sic] 7 Utah 2d 237, 239, 322[ ] P.2d 391, 393[ ] (1958)." 685 P.2d at 506. The evidence showed that some uncertainty concerning the boundary existed even prior to the survey. Testimony of various conversations indicates that Mr. Ritter and Mr. Liechty, a previous owner of Defendant's [sic] land, were uncertain of the boundary during some of their negotiations concerning a posslble [sic] sale and purchase of the Defendants' property some years prior to the survey. The Defendant's [sic] evidence demonstrated that the Plaintiffs were occupying ground up to a fence to the south which is in conjunction with the fence in dispute on the north enclosed area roughly equivalent to the acreage described in the Plaintiff's [sic] record title. This fact is consistent with an inference that the Plaintiffs recognized the North fence as the proper boundary, and also Plaintiffs [sic] view forces the inference that there was some uncertainty on their part concerning the proper boundaries of their [property] lips. On the basis of this evidence, the court finds that there existed as [sic] objectively measurable uncertainty [sic] concerning the proper boundary.

While the "objective uncertainty" element of our boundary by acquiescence test was recently overruled in *Staker v. Ainsworth*[8] and would no longer be required here, that does not negate the fact that the court's findings themselves demonstrate the clear existence of a dispute as to whether the fence line became the boundary by acquiescence. This fact is further supported by the evidence presented.

One witness for defendants, Richard York, testified that he had owned the Hutchings' property in the 1940s, that he

---

(Utah 1987). Notwithstanding comments to the contrary, the court is not required to marshal all the evidence supporting the trial court's findings before demonstrating the clearly erroneous nature thereof, *see* dissenting op. at 1091.

**6.** *Featherson,* 781 P.2d at 431–32; *Jackson Cattle Co.,* 744 P.2d at 1377.

**7.** *Supra* note 5 & accompanying text.

**8.** 785 P.2d 417.

had been responsible for the survey which the state of Utah had completed at one time, that he had personally observed the surveyors, and that he himself had set the present corner fence posts when he had owned the property. He specifically claimed that the corner post existing at the time of trial was "exactly the same" corner post that he had set, stating that he could identify it because "I know my work when I do it, and the work from my hands proves it to me." On cross-examination, however, this witness testified that he could not remember that a written survey was made, why the state had surveyed the property, whether survey stakes were set in the ground to mark a fence line, or who hired or paid for the survey. Nor could this witness identify the fence posts he claimed to have set when shown a picture of the same from an "unfamiliar" angle or remember how long he had owned the Hutchings' property or, for that matter, being deposed just two and a half months prior to his testimony at trial, wherein he had testified in contrast that he did not observe the survey being made, but had only been "told where it was." Further, he did not actually testify as to precisely when he had built the fence, and he admitted that the fence had changed and was, at the time of trial, made up of "pine posts, poles & this way & that way & every other direction [sic]."

Similarly, in testifying for defendants, Frank Rigtrup stated that the fence that existed at the time of trial was in the same location as the fence line in place when he had owned the property between 1946 and 1952. However, he also testified that he did not know if the corner posts were the same, that he had no knowledge that a survey was ever made, and that the latter fence was only "pretty close" to the fence which existed at the time he owned the property.

Thereafter, Victor J. Liechty testified that his father had purchased the Hutchings' property in 1952 and that the fence line had not subsequently been changed. He admitted, however, that he had been away from the area between 1955 and 1957 and since 1961 "and what transpired exactly during that period of time there [since 1961,] I don't know. I would have been gone a year at a time or more. So during that period of time some changes could have been made. But I have no knowledge of it." He also testified that he had no knowledge that any survey was made, that he had not seen the fence since 1982, and that he had no recollection that it was ever moved.

His most telling testimony was that at one time while his father owned the property, there were two or three feet of space between the fence and the Judds' barn—a fact which belies the conclusion that the location of the fence was never substantially altered, given the unrefuted testimony that at the time of trial, the fence was abutting the barn, which structure had not been moved.

Raphel C. Palfreyman did testify that although the fence had been repaired, there was never any reconstruction of the fence in its entirety for several years after he began working on the property in 1961. He stated that the corner posts had always existed since he had had anything to do with the property and that Dr. Judd had expressed interest in establishing the fence line as the boundary. However, he also testified that Dr. Judd at one time tore down the existing fence and erected a new fence at the time a cement ditch was poured "[a]s near as possible" to a dirt ditch which existed on the side of the fence of Hutchings' predecessors. And he admitted that although he "put a temporary fence up," he did not have access to the pasture on his side of the fence for a year after the new fence was erected since Dr. Judd's horses tore the fence out "three times while [Palfreyman] was trying to get a little use out of it."

Finally, Bernell C. Hutchings testified that he had owned his property for only two years but believed that the fence was in the same place as it had been in since 1956 when he had worked on that land as an 18-year-old. However, Mr. Hutchings had no recollection that the fence was moved and modified several times, that it ran near the barn, or that a ditch was excavated. Mr. Hutchings also testified

that the corner fence post was the identical post that had been in the ground since 1956, although he admitted that he had never inspected it before 1981. As to this fact, he specifically stated:

Q [by plaintiff's counsel] Is there anything about that particular corner post that brings it to your attention?

A Only that I posted a sign on it, "No trespassing," every pheasant season. And it's one that I recall being there— it's one where I take the water, because I have to crawl through the fence right there.

Q You began doing that when you purchased the property in 1981?

A Yes, that's correct.

Q But you never posted any signs there prior to that?

A No, I did not.

Q Did you ever have occasion, prior to 1981, to go and examine that post?

A I don't believe I did.

Most telling was the fact that Hutchings admitted that sometime since 1957 the fence had been rebuilt and moved in a substantial way onto his property to allow the Judds' cattle to drink from the canal. Regarding this change, Hutchings noted that he did not know when this portion of the fence was moved but that it was apparently not there in 1957, but had been erected by the time he purchased the property. This is evident from his testimony that he did not know the stock had been watering this way for many years and that he had personal knowledge of the existence of this change in the fence line for only five years.

In contrast, at trial three witnesses for the Judds testified that since 1953 the fence had been relocated several times, being completely removed in 1958 and rebuilt during 1977 and 1978 out of different materials and in different places at distances between two to five feet from previous fence lines. The fence was relocated because of snow damage and the excavating of a ditch and to prevent livestock from wandering. At least one makeshift fence was also constructed during this time, testimony of which indicated that it had been built a considerable distance from the present fence line.

Importantly, these witnesses all testified that the fence had been moved approximately two to three feet closer to the barn many years earlier after they noticed that snow falling off the barn was knocking the fence over. And at the time of trial, evidence demonstrated that the fence was abutting the barn.

The Judds further testified that although the descriptions of the two properties overlapped, they had paid the taxes for the entire property set forth in their deed description. Mr. Judd also testified that they had not been concerned about maintaining a "straight" fence line because they knew they owned property on both sides of the existing fence.

Finally, in contradiction to defendants' witnesses that claimed that the corner posts appeared to be identical to those existing since 1952 and 1961, William Judd testified that he himself had physically set the present corner fence posts as recently as 1967. And while he stated that the new posts were placed "along" the existing fence lines, he did not testify that he had rebuilt the fence in the exact location on which it had previously been built.

In summary, while all due deference is given the findings of the trial court, the lack of substantial credible evidence demonstrates that the findings in this case regarding defendants' acquiescence in an unaltered fence line for a long period of time are against the clear weight of the evidence and create a definite and firm conviction that a mistake has been committed.

Indeed, given the Judds' testimony, the fact that the fence line continued to be moved at distances of several feet as recently as 1978, and the conflicting nature of the testimony offered on the Hutchings' behalf, as well as the dispute in the findings themselves, the evidence does not support the conclusion that there was a "mutual acquiescence in the [fence] line as a boundary ... for a long period of time."[9]

9. *Parsons,* 690 P.2d at 538–39.

Under our established standard of review, then, I must conclude that the court erred in finding a boundary by acquiescence here.

The issue now becomes, which of the overlapping property lines is the appropriate boundary? Testimony at trial indicated that the Judds' property was deeded out of an 1883 United States land patent, while the Hutchings' property was similarly deeded in 1884. The conflict in description at issue was created at the time of the 1884 patent. Subsequent thereto, both parcels were held by a common owner until what is now the Hutchings' property was conveyed and recorded with its original 1884 description on June 12, 1940. The Judds' property was not conveyed and recorded with its original description until May 2, 1942.

Both parties urge application of the rule that where boundary conflicts exist within deeds from a common grantor, the title to the first deed executed is superior.[10] The Hutchings claim that their title is superior because their property was conveyed first after both parcels had merged in a common grantor. In contrast, the Judds contend that no merger of title occurred since "the same legal description came in as went out and ... the same conflict in descriptions existed." However, no support has been cited for this latter proposition, and none has been located.

Instead, the provisions of Utah Code Ann. § 57–3–2 (1986) (amended 1988) have application and provide in pertinent part:

(1) Every conveyance, or instrument in writing affecting real estate, executed, acknowledged, or proved, and certified, in the manner prescribed by this title, and every patent to lands within this state duly executed and verified according to law, and every judgment, order, or degree of any court of record in this state, or a copy of it, required by law to be recorded in the office of the county recorder, and every financing statement which complies with § 70A–9–402 shall, from the time of filing the same with the recorder for record, impart notice to all persons of their contents. Subsequent purchasers, mortgagees, and lien holders are deemed to purchase and take with notice.

Applying this statute, since the Hutchings' property was recorded before the recording of the Judds' deed, the Judds are deemed subsequent purchasers who took with notice of the Hutchings' interest in the conflicting property.[11]

As to the Judds' claim concerning merger, when the common grantor acquired both parcels, the titles merged and thereby resolved the conflict in the deeds. The fact that an identical conflict in title descriptions was subsequently created at the time of conveyance does not, under these circumstances, negate the doctrine of merger. A grantor is unable to again convey what he or she has previously conveyed and no longer owns.[12] When a grantor attempts to do so, the last grantee must generally bear the loss.[13]

I would reverse and remand with directions for entry of a decree quieting title to the land in question in defendants pursuant to the terms of their deed.

STEWART, J., concurs in the dissenting opinion of HALL, C.J.

---

10. *See generally Groeneveld v. Camano Bluepoint Oyster Co.,* 196 Wash. 54, 61, 81 P.2d 826, 829 (1938).

11. *Wilson v. Schneiter's Riverside Golf Course,* 523 P.2d 1226, 1227 (Utah 1974); *see Condos v. Trapp,* 717 P.2d 827, 830–32 (Wyo.1986).

12. *Condos,* 717 P.2d at 830.

13. *Id.* at 831–32 (last grantee is one who last records deed); *see also* Utah Code Ann. §§ 68–3–1, –2 (1986) (application of common law to statute).