2002 UT 33

**Leo H. AULT and Virginia Ault, Plaintiffs and Appellants,**

v.

**Darrell C. HOLDEN and Patsy E. Holden, Defendants and Appellees.**

Nos. 20000690, 20001008.

Supreme Court of Utah.

March 26, 2002.

William J. Hansen, Karra J. Porter, Salt Lake City, for plaintiffs.

Scott A. Broadhead, Tooele, for defendants.

RUSSON, Associate Chief Justice.

¶ 1 Leo and Virginia Ault (collectively, "the Aults") appeal from an order granting Darrell and Patsy Holden (collectively, "the Holdens") summary judgment, quieting title to two disputed parcels of property in the Holdens. We reverse and remand.

## BACKGROUND

¶ 2 This matter involves claims by two adjoining landowners to a strip of land that runs along their respective properties in Vernon, Utah ("the strip"), and to another parcel ("the western parcel"). See Figure 1.[1] The lot to the north of the strip is owned by the Aults. The lot south of the strip is owned by the Holdens. The Aults claim title to both of these disputed parcels by virtue of their warranty deed, and the Holdens claim title under the doctrine of boundary by acquiescence. The Holdens also claim that the Ault deed was defective and, in any case, was not

1. Figure 1 was utilized by both parties in their briefs.

Figure 1

recorded prior to the Holdens' deed and did not affect the Holdens' rights in the disputed property.

## I. RELEVANT PROPERTIES AND PROPERTY INTERESTS

¶ 3 The Aults purchased the north lot in 1962 from Clarence M. Plant and Anna M. Plant Ross pursuant to a uniform real estate contract. The real estate purchase contract provided for delivery of a warranty deed upon completion of a series of payments. This contract was recorded with the Tooele County Recorder's Office in December 1962. The payments were made, and Plant and Ross executed a warranty deed [2] on June 15, 1972, and delivered it to the Aults ("Ault deed"). The Aults recorded the deed on August 22, 1975.

¶ 4 On March 21, 1973, the Holdens purchased the property directly south of the Ault property.[3] They recorded the warranty deed conveying the south lot to them ("Holden deed") on April 9, 1973. Then, on February 26, 1976, the Holdens purchased a thin, triangle-shaped parcel of property ("triangular parcel") located on the west of the Holden property and west of the southern portion of the Ault property.

¶ 5 Along the border of the north and south lots sits the strip in question, which is approximately 30 feet wide and 553 feet long. On the north side of the strip is a fence line,[4] which runs westwardly from a county road— bounding the south lot, the north lot, and the strip on the east—to a point about 26 feet from the Ault property's western boundary, as defined by the Ault deed, and then turns northward. The Ault deed's legal description of the north lot expressly encompasses the strip, but the Holden deed's legal description of the south lot does not explicitly include the strip.

2. The Ault deed provides that the Aults' title is subject to the rights of parties in possession.

3. In late 1969, the Holdens began leasing the south lot.

4. Both parties agree that the fence predated the delivery of the Ault deed on July 15, 1972.

¶ 6 On the west, the fence continues northwesterly for about 115 feet. West of this section of the fence is the western parcel, a rectangular parcel of property. The western parcel, which is about 26 feet wide and 115 feet long, is also claimed by both the Aults and the Holdens. The legal description of the Ault property also expressly encompasses the western parcel, but the legal description of the Holden property does not. Whether the Holdens have occupied the western parcel for more than twenty years is unclear from the record and the parties' briefs, but the trial court specifically found that the "Holdens are in possession of the disputed property," implicitly finding that the Holdens occupied the western parcel.

¶ 7 Before purchasing the south lot, the Holdens leased the lot commencing in 1969. From that time, the Holdens occupied the south lot. They also used the strip in controversy up to the fence. Indeed, between April 1, 1972, and sometime in 1977, the Holdens leased the Ault property from the Aults. Further, the Holdens used the Ault property between 1982 and 1997.[5]

## II. CONVERSATIONS

¶ 8 At various times during the period relevant to this appeal, Darrell Holden and Leo Ault had conversations in which they discussed the strip. They both acknowledged that the fence did not demarcate the boundary between the Holden and Ault properties. The first conversation occurred in 1978. Another such conversation occurred during the early 1990s.[6] During this conversation, Ault apprised Holden that the fence was not the boundary. In response, Holden offered to trade a parcel of property to Ault in exchange for the strip or offered to purchase the strip from the Aults. However, neither a trade nor a purchase was ever consummated. Before the trial court, the

Holdens acknowledged that "those conversations took place."

¶ 9 In 1997, Ault told Holden that he did not want the Holdens on the Ault property because the Holdens had erected structures and fences on the Ault property without the Aults' consent. Subsequently, on June 2, 1998, the Holdens received a letter from Ault demanding that the Holdens remove their possessions from the Ault property.

## III. DEEDS AND SURVEYS

¶ 10 The legal description in the Ault deed defines all the courses to the Ault property: The last course simply states "[t]hence south 1.77 chains to the place of beginning, containing approximately 17 acres." The Holden deed provides that the northern boundary of the Holden property is "the South line of the A.M. Ross and C.M. Plant property." The parties do not dispute that this boundary description actually refers to the southern boundary of the Ault property.

¶ 11 Based upon the Ault and Holden deeds, several surveys of the Ault and Holden properties have been conducted during the time period relevant to this appeal. The first survey, the Rosenberg survey, was performed in 1969 and was a survey of the south lot. A second survey was completed by H.K. Bullen for the Holdens on July 8, 1974, in connection with Holden's 1976 purchase of the triangular parcel. The third was obtained by the Aults of the north lot in connection with previous litigation in the late 1970s or early 1980s. The fourth survey, dated July 5, 1998, was performed by D.H. Jensen and Associates.[7] Jensen and Associates surveyed both the Ault and Holden properties. All four of the surveys determined that both of the disputed parcels belonged to the Aults. However, the Jensen survey noted that the legal description of the Ault property in the Ault deed did not close.[8]

---

5. The parties dispute whether the Holdens used the property pursuant to a lease agreement or whether the Holdens merely managed the property for the Aults. Regardless of how the parties characterize the Holdens' use, it is undisputed that the Holdens had access to the Ault property and raised crops on it.

6. The exact date is unclear. In his deposition, Holden testified that this conversation occurred in 1990 "or so" and then added that the exact date "could be plus or minus five or six years."

7. Figure 1 shows a portion of the Jensen survey.

8. Often deeds are legally described by metes and bounds, which is a description of the boundary

Darrell Holden denies seeing the first three surveys until "the late '80s," including the Bullen survey that Holden requested.

## IV. PROCEDURAL HISTORY

¶ 12 On November 30, 1998, the Aults filed a complaint against the Holdens, asserting four causes of action: (1) quiet title, (2) conversion of personal property, (3) unjust enrichment, and (4) trespass. On February 8, 2000, the Holdens moved for summary judgment. On July 18, 2000, the district court granted the Holdens summary judgment, quieting title to the strip and the western parcel in the Holdens. Specifically, the trial court determined that the Holdens were entitled to the disputed parcels based on, inter alia, the doctrine of boundary by acquiescence. The trial court reasoned in the order granting summary judgment:

> The parties agree they had a conversation in 1978, that the fence was not the actual record boundary line as noted in their deeds. Nonetheless, the Aults did not seek to oust the Holdens from occupying the disputed property. In spite of the conversation, the objective evidence and conduct of the parties shows that they each acquiesced in the fence as their dividing line.

In its order, the trial court determined that the Holdens occupied the strip *for boundary by acquiescence purposes* between 1978 and 1998.

¶ 13 On August 1, 2000, the Holdens filed a verified memorandum of attorney fees and costs. The district court then awarded the Holdens $3,518.65 in costs and $13,550 in attorney fees. The Aults appealed.

¶ 14 On appeal, the Aults contend that the trial court erred by concluding that (1) the Holdens had established their ownership of the disputed parcels under the doctrine of boundary by acquiescence, (2) the Ault deed was ineffective in that it failed to close, and (3) the Ault deed was subject to the Holdens' rights in the disputed parcels because the

Holdens were parties in possession. Further, the Aults argue that the Holdens are not entitled to attorney fees or costs. In response, the Holdens argue that the trial court properly granted summary judgment to them and that they are entitled to attorney fees and costs.

## STANDARD OF REVIEW

¶ 15 Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c); *see also, e.g., State ex rel. Div. of Forestry, Fire & State Lands v. Tooele County,* 2002 UT 8, ¶ 8, 44 P.3d 680; *Tustian v. Schriever,* 2001 UT 84, ¶ 13, 34 P.3d 755. To determine whether a trial court properly granted summary judgment, we review the trial court's legal conclusions for correctness, affording those legal conclusions no deference. *Utah Coal & Lumber Rest., Inc. v. Outdoor Endeavors Unlimited,* 2001 UT 100, ¶ 9, 40 P.3d 581; *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.,* 2001 UT 54, ¶ 9, 28 P.3d 669. "Because summary judgment is granted as a matter of law, we may reconsider the trial court's legal conclusions." *Winegar v. Froerer Corp.,* 813 P.2d 104, 107 (Utah 1991). Additionally, when "reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *DCM Inv. Corp. v. Pinecrest Inv. Co.,* 2001 UT 91, ¶ 6, 34 P.3d 785.

## ANALYSIS

### I. BOUNDARY BY ACQUIESCENCE

¶ 16 The paramount issue in this case is whether the trial court erred in quieting title to the strip and the western parcel in the Holdens under the doctrine of boundary by acquiescence. For a court to quiet title in a parcel of property on the basis of boundary by acquiescence, the party claiming

---

line by length and direction. To properly close, the metes and bounds boundary description must begin and end at the same geographical point. To say a deed "fails to close" is to say that the legal description of the boundary of a parcel of

property does not completely describe the metes and bounds properly so that the boundary completely encompasses the parcel and returns to the point of the boundary description's inception.

title to property under the doctrine must establish " '(i) occupation up to a visible line marked by monuments, fences, or buildings, (ii) mutual acquiescence in the line as a boundary, (iii) for a long period of time, [and] (iv) by adjoining landowners.' " *Orton v. Carter,* 970 P.2d 1254, 1257 (Utah 1998) (quoting *Jacobs v. Hafen,* 917 P.2d 1078, 1080 (Utah 1996)). If the party attempting to establish boundary by acquiescence fails to satisfy any *one* of the elements of the doctrine, the boundary is defeated. *Goodman v. Wilkinson,* 629 P.2d 447, 448 (Utah 1981); *Hales v. Frakes,* 600 P.2d 556, 559 (Utah 1979).

¶ 17 In this case, the first element has been established with respect to the strip because the parties do not dispute that the Holdens have occupied and used the strip up to the fence. *See Edgell v. Canning,* 1999 UT 21, ¶ 7, 976 P.2d 1193.[9] Further, the fourth element has been established as to both parcels because the parties do not dispute that the properties in question are contiguous and that the parties are the respective owners. Therefore, we address only the second and third elements: whether (1) there was mutual acquiescence in the fence as a boundary (2) for a long period of time.

### A. Mutual Acquiescence

¶ 18 Under the doctrine of boundary by acquiescence, the party attempting to establish a particular line as the boundary between properties must establish that the parties mutually acquiesced in the line as separating the properties. *See Hales,* 600 P.2d at 559 ("Where there is no proof of acquiescence in the line as the boundary, there can be no boundary by acquiescence."). To do so, the party must show that *both* parties recognized and acknowledged a visible line, such as a fence or building, as the boundary of the adjacent parcels. *Id.; Florence v. Hiline Equip. Co.,* 581 P.2d 998, 1000 (Utah 1978); *Fuoco v. Williams,* 18 Utah 2d 282, 286, 421 P.2d 944, 947 (1966); *see also Carter v. Hanrath,* 925 P.2d 960, 960 (Utah 1996) ("The rule of boundary by acquiescence

serves a useful and practical purpose when applied ... where adjoining owners are seemingly content to *recognize* a marked line or monument not on the true line as the practical boundary between them." (emphasis added)). As explained in American Jurisprudence:

When adjoining landowners occupy their respective premises up to a certain line *which they mutually recognize and acquiesce in* for a long period of time, ... they are precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one. In other words, such recognition of, and acquiescence in, a line as the true boundary line, if continued for a sufficient length of time, will afford a conclusive presumption that the line thus acquiesced in is the true boundary line.... When the parties agree that the line to which they occupy is not the true line and agree subsequently to ascertain the true boundary, the quality of acquiescence is destroyed and no boundary is fixed by continued occupation.

12 Am.Jur.2d *Boundaries* § 83 (1997) (emphasis added). Acquiescence is defined as "[a] person's tacit or passive acceptance; implied consent to an act." *Black's Law Dictionary* 23 (7th ed.1999).

¶ 19 In other words, to acquiesce, a landowner must recognize and treat an observable line, such as a fence, as the boundary dividing the owner's property from the adjacent landowner's property, regardless of whether the landowner knows where the actual boundary lies or whether the boundary is uncertain. The acquiescence, or recognition, may be tacit and inferred from evidence, i.e., the landowner's actions with respect to a particular line may evidence the landowner impliedly consents, or acquiesces, in that line as the demarcation between the properties. *See, e.g., Van Dyke v. Chappell,* 818 P.2d 1023, 1027 (Utah 1991); *Judd Family Ltd. P'ship v. Hutchings,* 797 P.2d 1088, 1089–90 (Utah 1990); *Staker v. Ainsworth,* 785 P.2d 417, 420 (Utah 1990).

**9.** As to the western parcel, the parties have not adequately addressed the issue of occupancy and

we therefore will not address it.

¶ 20 In this case, the trial court granted summary judgment to the Holdens because "the Aults did not seek to oust the Holdens from occupying the disputed property." However, record property owners are not required to take legal action or otherwise "oust" someone adversely occupying their property to maintain their legal rights in their property. *See Hales*, 600 P.2d at 559 ("[T]he plaintiff's occupation to the fence without interference was not sufficient to establish defendant's acquiescence in the fence as a boundary."). They must only take some action manifesting that they do not acquiesce or recognize the particular line, e.g., a fence, as a boundary between the properties.

¶ 21 Indeed, mere conversations between the parties evidencing either an ongoing dispute as to the property line or an unwillingness by one of the adjoining landowners to accept the line as the boundary refute any allegation that the parties have mutually acquiesced in the line as the property demarcation. *See Van Dyke*, 818 P.2d at 1027 (illustrating that conversations about purchasing disputed property up to fence is evidence of whether parties have acquiesced in fence as boundary); *Judd Family Ltd. P'ship*, 797 P.2d at 1089 ("During that time, he had never heard any talk or suggestion that the fence was not the deed line."); *Parsons v. Anderson*, 690 P.2d 535, 539 (Utah 1984) (noting that plaintiff's objection to defendant's use of property was evidence that plaintiff never acquiesced in fence as boundary); *Williams v. Oldroyd*, 581 P.2d 561, 563 (Utah 1978) (stating that offers to purchase disputed property show parties had not acquiesced in boundary). Specifically, conversations in which a record owner unequivocally informs the other that he owns beyond the "visible line" claimed as a boundary, and that the owner does not recognize that line as separating the properties, are conclusive that a party has not acquiesced in the line as the property line.

¶ 22 In this case, the conversations between Ault and Holden are dispositive. On several occasions relevant to the establishment of boundary by acquiescence in this case, the Aults and the Holdens had conversations to the effect that the fence was not the boundary between their adjacent parcels. At a minimum, conversations occurred in 1978 and during the early 1990s. Indeed, evidence that the Holdens and the Aults discussed the possibility of the Holdens either purchasing or trading for the disputed parcels unequivocally shows that neither party actually acquiesced in the fence as a boundary; that conversation showed that neither tacitly consented to the fence as a boundary and instead both contemplated that the Aults would convey the disputed parcels to the Holdens via a traditional conveyance. The conversations establish not only that the Aults and the Holdens knew where the true boundary was, but that neither the Aults nor the Holdens ever recognized the fence as the boundary. These conversations conclusively repudiate any allegation that the parties acquiesced in the fence as the boundary when the conversations took place.

### B. For a Long Period of Time

¶ 23 To establish the third element of boundary by acquiescence, the occupation up to a visible line and mutual acquiescence must last for at least twenty consecutive years. *Jacobs v. Hafen*, 917 P.2d 1078, 1080 (Utah 1996); *see also Orton*, 970 P.2d at 1257; *Carter*, 925 P.2d at 960. The trial court concluded that the Holdens occupied the disputed parcels up to the fence and both parties acquiesced in the fence as a boundary from 1978 to 1998, when the Aults filed this suit. However, in light of the parties' conversations in 1978 and in the early 1990s indicating that the parties had not acquiesced in the property as the boundary, there have never been twenty continuous years of acquiescence—assuming that there ever was acquiescence—in the fence as a boundary. *See Parsons*, 690 P.2d at 539 (holding fifteen years of acquiescence insufficient to establish boundary by acquiescence).

¶ 24 Because the Holdens cannot, as a matter of law, show twenty continuous years of acquiescence in the fence as a boundary, the trial court erred in holding that the Holdens were entitled to the property under boundary by acquiescence.

## II. AULT AND HOLDEN DEEDS

¶ 25 In making their claims to the disputed parcels, however, the Holdens do not rely solely on the doctrine of boundary by acquiescence. In addition to their boundary by acquiescence claim, the Holdens also claim that (1) the Ault deed is defective in that the boundary description was incomplete (failed to close), (2) the Holdens recorded the Holden deed before the Aults recorded the Ault deed, and (3) the Holdens held rights in the disputed parcels to which the Ault deed was subject when the Holdens were in possession of those parcels. In granting the summary judgment, the trial court held, as a matter of law, that the Ault deed "is insufficient to convey title, the description therein failing to close" and "is insufficient to convey title adverse to the interest of [the] Holdens, it being subject to the rights of parties in possession and [the] Holdens being in possession on August 22, 1975, when the Ault deed was recorded."

### A. Deed Failing to Close

¶ 26 The trial court concluded that the Ault deed failed to convey title to the Aults when its legal description set forth therein was indefinite because it failed to close. In Utah, a warranty deed conveys title so long as the deed's description of the property is "*sufficiently definite ... to identify the property it conveys.*" *Colman v. Butkovich,* 556 P.2d 503, 505 (Utah 1976) (emphasis added). In other words:

> The fact that parts of the description given of the property are incorrect or incomprehensible will not destroy the operative effect of a conveyance, if a sufficient part of the description remains for purposes of identification. In such cases the misdescription will be ignored and the land held to be sufficiently described. *The test is said to be whether a surveyor or engineer with the deed before him and with or without the aid of extrinsic evidence can locate the land and establish the boundaries.*

23 Am.Jur.2d *Deeds* § 54 (1983) (emphasis added).

¶ 27 In this case, surveyors prepared four different surveys based upon the Ault deed:
the Rosenberg survey, the Bullen survey, the Jensen survey, and the survey prepared for the Aults' previous litigation. In each, the surveyors were able to identify the Ault property and establish the boundaries thereof pursuant to the legal description set forth in the Ault deed, including the boundary between the Ault and Holden properties.

¶ 28 While it is undisputed that the distance measurement of the final call of the legal description in the Ault deed does not extend to the point of beginning so as to close, the deed did not fail to convey the north lot to the Aults. "In the construction of boundaries, we ... find that the intention of the parties is the controlling consideration." *Losee v. Jones,* 120 Utah 385, 395, 235 P.2d 132, 137 (1951); *see also Cornish Town v. Koller,* 758 P.2d 919, 921 (Utah 1988). Indeed, we held in *Losee* that a deed sufficiently describing property conveys the property intended to be conveyed, although the description does not close according to the distance measurement articulated in the final call, so long as the intention is clear from the deed. 120 Utah at 394–96, 235 P.2d at 137.

¶ 29 In *Losee,* the final distance call of the property description failed to return to the point of beginning; that call concluded with "thence east 2.5 chains more or less to place of beginning." 120 Utah at 395, 235 P.2d at 137. We held that such a description sufficiently described the property because "the intention [of the grantor was for] the tract [to] close by extending the final call to place of beginning, and the words 'more or less' constitute a tolerance factor which enables this extension of the final distance, beyond the 2.5 chains, in order that the tract close." *Id.*

¶ 30 The language of the legal description in the Ault deed parallels the language of the legal description at issue in *Losee.* Here, the description culminates with the phrase "thence south 1.77 chains to the place of beginning, containing approximately 17 acres." As in *Losee,* this description concludes with "to the place of beginning," manifesting the grantor's intent that the description close at the point where the legal

description began. *Id.* Further, the property description in the Ault deed concluded with the phrase "containing *approximately* 17 acres" (emphasis added), which serves as a "tolerance factor [that] enables the extension of the final distance" so that the deed closes. 120 Utah at 395, 235 P.2d at 137. Therefore, surveyors were able to identify the Ault property although they had to extrapolate the final call "to the place of beginning," closing the legal description and effectuating the intent of the grantors. Because surveyors can identify the Ault property according to the deed's legal description, the Ault deed is sufficient to convey the property described.

### B. Deed Recording

¶ 31 The Holdens contend that under Utah's "race to the registry" [10] system, the Holdens title is paramount to the Aults' title, and the Holdens are thus entitled to the property because they recorded their deed before the Aults recorded their deed. In Utah, between two purchasers of real property, the first to validly record a conveyance and take the property without notice of a prior interest in the property takes the property over a purchaser who subsequently records a deed. *See Wilson v. Schneiter's Riverside Golf Course*, 523 P.2d 1226, 1227 (Utah 1974). The Utah Code provides:

> Each document not recorded as provided in this title is void as against any subsequent purchaser of *the same real property, or any portion of it,* if:
>
> (1) the subsequent purchaser purchased the property in good faith and for a valuable consideration; and
>
> (2) the subsequent purchaser's document is first duly recorded.

Utah Code Ann. § 57–3–103 (2000) (emphasis added).

¶ 32 While it is undisputed the Holdens duly recorded their deed before the Aults recorded their deed, the Ault deed is not void as against the Holdens with respect to the disputed parcels because the Holden deed does not describe "the same real property" as the Ault deed, "or any portion of it." *Id.*

¶ 33 The legal description in the Ault deed explicitly encompasses both the western parcel and the strip. Conversely, the Holden deed describes neither the strip nor the western parcel because the northern boundary of the Holden property is defined in the Holden deed legal description as "the South line of the A.M. Ross and C.M. Plant property," which the parties agree refers to the Ault property. The south line of the Ault property is not the fence,[11] *see supra* part I, but the boundary articulated in the Ault deed legal description. *See Hancock v. Planned Dev. Corp.*, 791 P.2d 183, 185 (Utah 1990) (noting that "a specific description will control or limit a general description"); *Neeley v. Kelsch*, 600 P.2d 979, 982 (Utah 1979) ("The specific description in chains and degrees prevails over the general reference [to the location of a boundary]."). Indeed, the Holden deed by its own terms excludes any property specifically included in the Ault deed.

¶ 34 We addressed a similar situation in *Neeley*, in which the defendants recorded their deed to a parcel of property before the plaintiff recorded. 600 P.2d at 980. However, the metes and bounds description in the defendants' deed did not include the disputed property. *Id.* Conversely, the plaintiff's deed "included the disputed property and was recorded," although it was recorded after the defendants recorded their deed. *Id.* at 982. Thus, we concluded that "under the recording act, [the defendants'] claim to the land [wa]s void." *Id.*

¶ 35 Similarly, in this case, where the Holden deed describes neither the strip nor the

---

**10.** The Holdens incorrectly state that Utah is a "race to the registry" system. Actually, Utah has a race-notice recording statute. *See* Utah Code Ann. § 57–3–103 (2000); *Neeley v. Kelsch,* 600 P.2d 979, 982 (Utah 1979); *South Sanpitch Co. v. Pack,* 765 P.2d 1279, 1280–81 (Utah Ct.App. 1988).

**11.** The Holdens state that Raymond Pehrson testified the fence was the boundary between the northern parcel, which was owned by Ross and Plant before it was owned by the Aults, and the southern parcel. However, Pehrson stated only that the fence had been in existence for sixty-nine years and never testified that it was the boundary between the properties.

western parcel, the Holdens are precluded from claiming the disputed parcels by recording their deed before the Ault deed was recorded. Therefore, the Holdens cannot claim that the Ault deed is void as against them when first duly recorded because their deed does not cover "the same real property." Utah Code Ann. § 57–3–103.

### C. Rights of Parties in Possession

¶ 36 The trial court concluded, "The warranty deed to [the] Aults alleged in the complaint is insufficient to convey title adverse to the interest of [the] Holdens, it being subject to the rights of parties in possession and [the] Holdens being in possession on August 22, 1975, when the Ault deed was recorded." To determine whether the trial court was correct in concluding that the Ault deed was amenable to the Holdens' rights in the property, we must review the Ault deed.

¶ 37 Deeds are construed like other written legal instruments. *Hartman v. Potter*, 596 P.2d 653, 656 (Utah 1979). "In the absence of ambiguity, construction of a deed is a question of law," *Terry v. Price Mun. Corp.*, 784 P.2d 146, 149 (Utah 1989), that we review for correctness, *Jones v. ERA Brokers Consol.*, 2000 UT 61, ¶ 12, 6 P.3d 1129. When we construe a deed, we are not bound by the trial court's conclusions regarding the meaning of the deed. *Cornish Town*, 758 P.2d at 921; *Hartman*, 596 P.2d at 656.

¶ 38 "The paramount rule of construction of [a] deed[ ] is to give effect to the intent of the parties as expressed in the deed...." *Hancock*, 791 P.2d at 185; *see also Cornish Town*, 758 P.2d at 921; *Creason v. Peterson*, 24 Utah 2d 305, 309, 470 P.2d 403, 405 (1970). Specifically, we determine the parties' intent from the plain language of the four corners of the deed. *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599; *see also Cornish Town*, 758 P.2d at 921; *Wood v. Ashby*, 122 Utah 580, 585, 253 P.2d 351, 353 (1952).

¶ 39 The Ault deed provides that it is "subject to *the rights of parties in possession.*" (Emphasis added.) This language is unambiguous. This clause in the Ault deed does not create any rights in the Holdens,

but rather was only a recognition that parties in possession of the property may have rights in the property "against which the grantor did not warrant title." *Johnson v. Peck*, 90 Utah 544, 550, 63 P.2d 251, 254 (1936). "The words 'subject to' used here are commonly associated with attempts by grantors to give notice of encumbrances...." *Hancock*, 791 P.2d at 186.

¶ 40 In *Hancock*, the trial court determined that language in a deed that stated the deed was "subject to a fence line encroachment along the east line" reserved in the grantor the property east of the fence line, "which otherwise would have passed under the metes and bounds description." 791 P.2d at 185. However, we determined that the clause did not reserve the property to the grantor, but rather placed the grantee on notice that another may attempt to acquire the property by boundary by acquiescence "in order to insulate herself from a suit by ... grantee ... in the event [that a] claim of title to the strip of land by acquiescence proved to be valid." *Id.* at 185–86. Thus, we concluded that the defendant could obtain title to the property only by boundary by acquiescence, not under the "subject to" clause of the deed. *Id.* at 187.

¶ 41 Here, the trial court concluded that the Ault deed did not convey title to the disputed parcels to the Aults where that deed was adverse to the right or interest of the Holdens as a party in possession. It is undisputed that the Holdens were in possession of the strip when the Aults recorded their deed on August 22, 1975. The Holdens contend that their possession of the disputed parcels placed the Aults on notice of their claim of title.

¶ 42 However, possession requires only inquiry into any rights in the property the possessor may hold. *Hottinger v. Jensen*, 684 P.2d 1271, 1273 (Utah 1984). Traditionally, in race-notice states like Utah, a purchaser takes subject to rights of parties in possession that are open and visible. *See, e.g., Mathis v. Madsen*, 1 Utah 2d 46, 57, 261 P.2d 952, 959 (1953); *Neponset Land & Live–Stock Co. v. Dixon*, 10 Utah 334, 336–37, 37 P. 573, 574 (1894); *Ayers v. Jack*, 7 Utah 249, 252–53, 26 P. 300, 300 (1891). In

other words, possession by someone other than the seller engenders a duty to inquire on the part of the purchaser into the rights of the party in possession. *See Webster v. Knop*, 6 Utah 2d 273, 278, 312 P.2d 557, 560 (1957); *Salt Lake, Garfield & W. Ry. Co. v. Allied Materials Co.*, 4 Utah 2d 218, 222, 291 P.2d 883, 886 (1955); *Williams v. Barney*, 119 Utah 61, 84–85, 224 P.2d 1042, 1053 (1950); *Meagher v. Dean*, 97 Utah 173, 179, 91 P.2d 454, 456 (1939). However, where a party in possession has no rights adverse to the purchaser, the property is conveyed to the purchaser free of any alleged right of the possessor.

¶ 43 Proper inquiry by the purchaser "would [only] lead to actual knowledge as to the state of title." *Johnson v. Bell*, 666 P.2d 308, 310 (Utah 1983). In this case, inquiry into the state of the Holdens' title would have informed the Aults that the Holdens did not hold an ownership right in the disputed land contrary to the Aults' ownership under the Ault deed. The Holden deed covered neither the strip nor the western parcel, and the deeds do not conflict.

¶ 44 The only right the Holdens held in the property at the time the Aults recorded their deed was a leasehold from an agreement with the Aults, which is not contrary to the Ault deed. Between 1972 and 1977, the Holdens leased the Ault property from the Aults and were entitled to possession of the Ault property as lessees. Thus, the only rights the Holdens held as a party in possession in this case were limited to the Holdens' rights set forth in the lease agreement, and therefore, the Ault deed was, at most, subject to the rights and interests the Holdens held in connection with the lease agreement. *See* 66 Am.Jur.2d *Records and Recording Laws* § 188 (1973). Therefore, the trial court erred by concluding that the Ault deed was subject to any ownership rights in the property although the Holdens were a party in possession.

## III. CONCLUSION AS TO TITLE

¶ 45 Because the trial court erred by quieting title in the Holdens, we reverse and remand to the trial court. Specifically, we reverse the summary judgment and remand

with directions to quiet title in favor of the Aults consistent with this opinion.

## IV. ATTORNEY FEES AND COSTS

¶ 46 The Holdens are not entitled to attorney fees or costs in this case. Whether a party may recover attorney fees in an action is a question of law that we review for correctness. *Warner v. DMG Color, Inc.*, 2000 UT 102, ¶ 21, 20 P.3d 868. Likewise, although the question of whether costs should be awarded is within the discretion of the trial court, in this case, where the "mandatory language" of rule 54(d) is applicable and "leaves no discretion to the court," we review the trial court's award of costs for correctness. *Lyon v. Burton*, 2000 UT 19, ¶ 76, 5 P.3d 616.

¶ 47 In Utah, attorney fees are typically awarded only pursuant to statute or contract. *Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 69, 44 P.3d 663. In this case, the relevant statute, section 78–27–56(1), provides:

> In civil actions, the court shall award reasonable attorney's fees to a *prevailing party* if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith.

Utah Code Ann. § 78–27–56(1) (1996) (emphasis added). In addition, rule 54(d) of the Utah Rules of Civil Procedure, which governs when costs are awarded, provides that "costs shall be allowed as of course to the *prevailing party*." Utah R. Civ. P. 54(d)(1) (emphasis added).

¶ 48 A court may award attorney fees under section 78–27–56 and/or costs under rule 54(d) only to a prevailing party. Utah Code Ann. § 78–27–56(1); Utah R. Civ. P. 54(d); *see also Robinson v. State*, 2001 UT 21, ¶ 19, 20 P.3d 396; *Faust v. KAI Techs., Inc.*, 2000 UT 82, ¶¶ 15–16, 15 P.3d 1266. To be a prevailing party, a party "must obtain at least some relief on the merits" of the party's claim or claims. *Crank v. Utah Judicial Council*, 2001 UT 8, ¶ 38, 20 P.3d 307. In this case, we reverse the trial court's summary judgment award in favor of the Holdens in its entirety, denying them any relief on the merits at this point in the litigation. Given our reversal, we also reverse the

award of attorney fees and costs because the Holdens are no longer the prevailing party. *See Harper v. Summit County,* 2001 UT 10, ¶ 40, 26 P.3d 193 (reversing attorney fee award when case was reversed); *Hatch v. Boulder Town Council,* 2001 UT App 55, ¶ 15, 21 P.3d 245 ("In light of our [reversal based upon] the merits of this case, Appellees are not entitled to an award of attorney fees as prevailing parties [under section 78–27–56(1) ].").

## V. THE AULTS' CAUSES OF ACTION

¶ 49 The Aults' claims against the Holdens for conversion, unjust enrichment, and trespass were not considered by the trial court inasmuch as these claims were dependent upon title to the disputed parcels being in the Aults. Because it has been determined that the Aults indeed hold title to the disputed parcels, their claims are revived and subject to further proceedings consistent with this opinion on remand to the trial court.

## CONCLUSION

¶ 50 In view of the foregoing, we reverse the trial court and remand for further proceedings consistent with this opinion.

¶ 51 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Chief Justice RUSSON's opinion.